Johnnie BROWN, Aldo Colussi, Aniello Madonna, Vincent Scavetta, Theodore King, Chester Broman, Joseph J. Ferrara, and Frank Finkel, as Trustees and Fiduciaries of the Local 282 Welfare, Pension, Annuity and Job Training Trust Funds, Plaintiffs–Appellants,

v.

SANDIMO MATERIALS, Rual Trucking Co., Almar Supplies, Inc., and Alfredo Lamanna Trucking, Inc., Defendants–Appellees.

No. 00–7219.

United States Court of Appeals, Second Circuit.

Argued Dec. 13, 2000.

Decided May 14, 2001.

Luigi P. DeMaio, Crocco & DeMaio P.C., Mount Kisco, NY, for Appellants.

Eugene S. Friedman, Friedman & Levine, New York, N.Y. (William K. Wolf and William Anspach on the brief), for Appellees.

Before CARDAMONE, PARKER, KATZMANN, Circuit Judges.

KATZMANN, Circuit Judge:

Defendants, a group of family-owned companies, appeal from a judgment entered on March 21, 2000, in accordance with Findings of Fact and Conclusions of Law entered on January 31, 2000 (Leonard Wexler, *Judge* ), ordering plaintiffs to pay $7,536,021.59 plus interest to the Trustees and Fiduciaries of the Local 282 Welfare, Pension, Annuity and Job Training Trust Funds (the "Trustees") to compensate for unpaid contributions. Because we find that defendants were entitled to a jury trial, we vacate the judgment and remand the case to the District Court.

## I. Background

In 1994, pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132(a)(3); 1132(d)(1); 1132(e); 1132(f); 1132(g)(2), and section 301 of the Labor Management Relations Act ("LMRA"), the Trustees brought suit against the defendant companies for unpaid contributions to the Local 282 Welfare, Pension, Annuity and Job Training Trust Funds (the "Funds"). Although only one of the companies, Sandimo Materials, Inc. ("Sandimo"), was a signatory to collective bargaining agreements requiring such contributions, the district court found the defendant companies jointly and severally liable for the unpaid contributions. The companies were held liable for unpaid contributions under agreements signed by Sandimo, as well as for payments under two agreements never signed by any of the defendants, but found by the court to have been adopted by Sandimo.

The defendant companies are all owned and operated by Alfredo Lamanna and his family. In 1972, Alfredo Lamanna formed Alfredo Lamanna Trucking, Inc. ("ALT"), which began as a trucking company, but in 1973 ceased all of its trucking operations to sell sand, gravel, and other building materials. Alfredo Lamanna, the President of ALT, owns fifty percent of ALT, and his sons, Sabatino Lamanna and Emilio Lamanna, who are both officers, each own twenty-five percent. In 1973, Alfredo Lamanna and his brother-in-law, Rudolfo Branchinelli, formed defendant Rual Trucking Co., Inc. ("Rual") to haul the types of building materials sold by ALT. Again, Alfredo Lamanna, who served as an officer of Rual, owned fifty percent of the company, and his sons each owned twenty-five percent. Rual ceased its operations in 1993. In 1979, Sabatino Lamanna and Emilio Lamanna, with the help of

their father, formed Sandimo, a "unionized" trucking company engaged in the hauling of building materials. The brothers are officers of Sandimo, and each owns fifty percent of its stock. Finally, in 1989, Alfredo Lamanna helped his daughter, Rossana Lamanna Bartone form Almar Supplies, Inc. ("Almar"), which until 1993 operated a nursery and sold related materials. In 1993, the same year Rual was dissolved, Almar stopped selling gardening materials and became instead a trucking business, hauling the same kinds of building materials hauled by Rual and Sandimo. Rossana is an officer of Almar, and its sole shareholder.

Sandimo signed a series of collective bargaining agreements ("CBAs") with Local 282, a labor union representing truck drivers. As stated by the district court, the relevant contracts for the purposes of this case are: "(1) the New York City Ready–Mix Concrete, Sand, Gravel and Bulk Cement 1984–1987 Contract, covering the period from July 1, 1984 to June 30, 1987 (the '1984–1987 Ready–Mix Agreement'); (2) the New York City Ready–Mix Concrete, Sand, Gravel and Bulk Cement Agreement 1987–1990 Contract, covering the period from July 1, 1987 to June 30, 1990 (the '1987–1990 Ready–Mix Agreement'); and (3) the New York City Heavy Construction and Excavating Industry, Memorandum of Agreement, covering the period from July 1, 1993 to June 30, 1996, but which was signed by Sandimo and became effective March 1, 1994 (the '1993–1996 Excavating Agreement')." The district court found that these agreements, in conjunction with an Agreement and Declaration of Trust entered into by Local 282 and signatory employers, "required Sandimo to make contributions to the Funds in specified amounts for each hour of work in employment covered by the agreements." The 1990–1993 Ready–Mix Agreement and the 1993–1996 Excavating Agreement pro-

hibit Sandimo from running a "double-breasted operation"—that is, creating side-by-side union and non-union entities— within the New York region.

As indicated above, Sandimo was not a signatory to any Local 282 CBA between July 1, 1990 (when the 1987–1990 Ready–Mix Agreement expired) and February 28, 1994 (after which it signed the 1993–1996 Excavating Agreement). The district court found that there were at least two applicable CBAs Sandimo could have signed during this period: "(1) the New York City Ready–Mix Concrete, Sand, Gravel and Bulk Cement 1990–1993 Contract, covering the period from July 1, 1990 to June 30, 1993 (the '1990–1993 Ready–Mix Agreement'); and (2) the New York City Ready–Mix Sand, Gravel and Bulk Cement Industry, Memorandum of Agreement, covering the period from July 1, 1993 to June 30, 1996 (the '1993–1996 Ready–Mix Agreement')."

Although it did not sign the 1990–1993 and 1993–1996 Ready–Mix Agreements, the district court determined that Sandimo complied with the terms of these two agreements in numerous respects. In particular, the court found that after the expiration of the 1987–1990 Ready–Mix Agreement, Sandimo (1) "continued to work with only union drivers who were members of Local 282"; (2) "continued to perform the same work out of the same location with the same trucks"; (3) paid wages in accordance with the 1990–1993 and 1993–1996 Ready–Mix CBAs; (4) "continued to remit hourly building fund dues and hourly union dues checkoff on a monthly basis," increasing the amount remitted when changes were made to the CBAs; (5) "continued to recognize a Local 282 shop steward and continued to recognize seniority rights"; (6) submitted to audits by the Fund Trustees and paid any delinquent amounts indicated by those audits; and (7)

made certain contributions to the health and welfare funds, resulting in benefits being paid out by the funds to Sandimo workers. In addition, in a letter to Local 282 dated March 2, 1994, Emilio Lamanna, on behalf of Sandimo, stated, "Please be advised ... I will no longer make any payments against the New York City Ready–Mix contract. I respectfully request that all of my payments be applied to the New York City Excavation Contract." The district court declared that this statement evinced a prior intent to comply with the then-extant Ready–Mix Agreements.

The district court found considerable overlap in the management and operation of the Lamanna family businesses. Regarding the management of these businesses, the court stated that "Alfredo is the president of ALT and was an officer of Rual. Sabatino and Emilio are both officers of ALT and Sandimo. Sabatino and Emilio signed Rual and Sandimo checks, and had check signing authority for ALT." The court also noted the integrated operations of the defendant companies. First, it found that Sandimo, Rual, and ALT all operated out of the same truckyard in Maspeth, New York, and that Almar operated from a Rosedale, New York, property owned by Alfredo, Sabatino and Emilio Lamanna. Sandimo and Rual shared an office, telephone number (which was answered "Lamanna" and not "Sandimo" or "Rual"), and office equipment, and employed the same clerical staff.

The court next found that Sandimo did not own its trucks, but rather used trucks that were owned by ALT and Rual and maintained and insured by ALT. While these trucks were ostensibly leased on a daily basis, there were no written agreements memorializing the lease arrangement, and although there were transfers of funds among ALT, Rual, and Sandimo, no

documentation indicated that such transfers were made in connection with the leases. In 1993, when Rual dissolved, Alfredo Lamanna gave Sabatino Lamanna the fleet of Rual trucks, which were used to transform Almar from a nursery business into a trucking company. The court found that while Rossana Lamanna Bartone is an officer of Almar, Emilio and Sabatino Lamanna have been significantly involved in the management of the company, and that Alfredo Lamanna has directly paid some of Almar's expenses. Moreover, family members were paid "management consulting" fees or placed on the payroll of companies for which they did not formally work. Since 1988, the defendant companies have shared an accountant, who is paid $750 per month, by different companies at different times.

The district court found that between January 1989 and December 1996, Rual and Sandimo shared drivers, and that the drivers "worked alongside each other every day and were dispatched by Alfredo, Sabatino or Emilio, sent to the same locations, and delivered to the same customers. Each driver drove the same truck every day and performed the same work, and hauled the same materials, regardless of which defendant paid him." The extent of the overlap in workforce was emphasized by the district court, which declared:

> [I]n the 52 pay periods of 1991, there were 446 instances when a Sandimo driver received a check from both Sandimo and Rual in the same week, a total of 93% of the time. In a 38 week period in 1993, there were 289 instances when a Sandimo driver received a check from both Sandimo and Rual in a given week, a total of 95% of the time. After Rual closed in 1993, 19 of the 21 drivers on the 1993 Rual payroll were transferred to either the 1994 Sandimo payroll or the 1994 Almar payroll, or both payrolls.

Based on these findings, the district court, sitting as the trier of fact, found: (1) that although Sandimo did not sign the 1990–1993 and 1993–1996 Ready–Mix CBAs, it adopted those agreements through its material compliance with their terms; (2) that because the companies operated as a single enterprise and their employees could be considered a single bargaining unit, ALT, Rual, and Almar could be held to the terms of the CBAs signed or adopted by Sandimo; (3) that because the companies were "alter egos" of one another, each could be held to the agreements signed or adopted by another; (4) that Almar is subject to liability as a successor to Rual; and (5) that the companies had violated the prohibition against running a "double breasted" operation contained in the 1990–1993 Ready–Mix Agreement and the 1993–1996 Excavating Agreement.

Defendants, in addition to their legal arguments on appeal, contest the factual determinations made by the district court in several respects. Beside broad disagreements with the district court about the extent and nature of the shared labor, equipment and facilities, they argue, for example, that Emilio and Sabatino Lamanna were not in fact shareholders of ALT as indicated on certain unsigned tax returns, and that amended returns were submitted correcting this error. They contend that the ALT trucks used by Sandimo were indeed leased, and that "Sandimo paid for the lease of the trucks through an agreed upon reduction in the amount per load that it charged [ALT] for delivering to its customers." Perhaps most importantly, they argue that Sandimo repeatedly refused to sign the CBAs it is charged with having adopted, and that when it did eventually sign another agreement (the 1993–1996 Excavating Agreement), its terms differed materially from the CBAs it had refused to sign.

## II. Discussion

■ Plaintiffs apparently moved to strike the defendants' jury demand at a status conference held on March 31, 1998. Although the parties submitted letter briefs on the issue in April, the District Court did not resolve the motion until the first day of trial, August 31, 1998, when it announced that it would grant plaintiffs' motion. Defendants now appeal the district court's ruling. Whether defendants were entitled to a jury trial is a question of law, which we review *de novo. See, e.g., Thomas v. Oregon Fruit Prods. Co.,* 228 F.3d 991, 995 (9th Cir.2000); *Adams v. Cyprus Amax Minerals Co.,* 149 F.3d 1156, 1158 (10th Cir.1998).

■ As indicated above, the plaintiffs brought the instant suit under both ERISA and the LMRA. In determining whether a given statute entitles the parties to a jury trial, we must first examine the statutory language to determine whether we can discern a congressional intent to grant a jury right. *See Feltner v. Columbia Pictures Television, Inc.,* 523 U.S. 340, 345, 118 S.Ct. 1279, 140 L.Ed.2d 438 (1998) (citing *Tull v. United States,* 481 U.S. 412, 417 n. 3, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987)). We begin by analyzing section 301 of the LMRA, 29 U.S.C. § 185(a), which states:

Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a) (1998). There is nothing here to indicate, explicitly or implicitly, whether Congress intended such claims to be tried to a jury. *See Bugher v. Feightner,* 722 F.2d 1356, 1357 (7th Cir.1983); *cf. Lorillard v. Pons,* 434 U.S. 575, 583, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978) (finding that Congress's use of the term "legal relief" in specifying the availability of remedies to be a term of art connoting the right to a jury).

 As the LMRA itself is silent on the issue, we must next consider whether a jury right inheres in the plaintiffs' claim by virtue of the Seventh Amendment. *See Feltner,* 523 U.S. at 347, 118 S.Ct. 1279. "The Seventh Amendment does apply to actions enforcing statutory rights, and requires a jury trial upon demand, if the statute created legal rights and remedies, enforceable in an action for damages in the ordinary courts of law." *Curtis v. Loether,* 415 U.S. 189, 194, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974). In assessing whether a given statutory provision entitles a party to a jury trial under the Seventh Amendment, we look both to the historical treatment of analogous cases and to the type of remedy available to determine whether a cause of action is one of law (thus triggering the jury right) or one of equity (in which case no jury right is available). *See, e.g., Feltner,* 523 U.S. at 348, 118 S.Ct. 1279; *Chauffeurs, Teamsters & Helpers Local No. 391 v. Terry,* 494 U.S. 558, 565, 110 S.Ct. 1339, 108 L.Ed.2d 519 (1990). The more important of these two questions is that of the available remedy. *See Terry,* 494 U.S. at 565, 110 S.Ct. 1339. Plaintiffs' characterization of the remedy sought is not necessarily controlling on this point. *See Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 477–78, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962) ("[W]e think it plain that [plaintiffs'] claim for a money judgment is a claim wholly legal in its nature however the complaint is construed.... [T]he constitutional right to a trial by jury cannot be made to depend upon the choice of words used in the pleadings").

 Plaintiffs' claim under section 301 of the LMRA is, at base, a claim for breach of contract, which has historically been uniformly treated as a legal claim.[1] *See Terry,* 494 U.S. at 569–71, 110 S.Ct. 1339; *Kalish v. Franklin Advisers, Inc.,* 928 F.2d 590, 592 (2d Cir.) (per curiam), *cert denied* 502 U.S. 818, 112 S.Ct. 75, 116 L.Ed.2d 48 (1991); *Bugher,* 722 F.2d at 1358; *Ches v. Archer,* No. Civ. 88–433E, 1989 WL 132035, at *2 n. 5 (W.D.N.Y. Oct.25, 1989); *Zotto v. Scovill, Inc.,* No. N–85–494 (JAC), 1987 WL 49862, at *6 (D.Conn. May 27, 1987); *see also Dairy Queen,* 369 U.S. at 479, 82 S.Ct. 894. Plaintiffs seek to establish, first, which parties are bound by the relevant CBAs, and second, that those parties violated the terms of the CBAs. While plaintiffs are, of course, correct in their assertion that not all claims for monetary relief are "legal" in nature, *see Terry,* 494 U.S. at 570, 110 S.Ct. 1339 (citing *Curtis* 415 U.S. at 196, 94 S.Ct. 1005), their argument that what they seek is, in effect, restitution (an equitable remedy, *see Mertens v. Hewitt Assocs.,* 508 U.S. 248, 255, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993); *Juliano v. Health Maint. Org. of N. J., Inc.,* 221 F.3d 279, 292 (2d Cir.2000)), is unavailing. The equitable remedy of restitution is appropriate only where there has been a showing of unjust enrichment. *See, e.g., Terry,* 494 U.S. at 570–71, 110 S.Ct. 1339; *Geller v.*

---

1. Although the district court conducted most of its analysis as if the only claims brought were plaintiffs' claims under ERISA, there is no indication that the LMRA claims were dismissed, and the court in fact found the defendants liable for breach of contract based on its determination that they had conducted a "double-breasted" operation.

*County Line Auto Sales, Inc.*, 86 F.3d 18, 22 (2d Cir.1996). The gravamen of plaintiffs' claim is not that the defendants "had wrongfully secured a benefit, or had passively received one which it would be unconscionable for [them] to retain," *Geller*, 86 F.3d at 22 (quotation marks and citation omitted), but that defendants violated the terms of the 1990–1993 and 1993–1996 Ready–Mix Agreements, having either adopted those contracts or engaged in conduct which made them liable as a single employer or as alter egos of one another.

█ While we are confident in our interpretation of plaintiffs' LMRA claim, we also note that before equitable relief will be granted, plaintiffs must show that they have no adequate remedy at law. *See Dairy Queen*, 369 U.S. at 478, 82 S.Ct. 894. Here, we can discern no such inadequacy.

█ "Maintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care." *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 501, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959); *see also Jacob v. City of New York*, 315 U.S. 752, 752, 62 S.Ct. 854, 86 L.Ed. 1166 (1942) (stating that the right to trial by jury in civil cases is "a basic and fundamental feature of our system of federal jurisprudence" which "should be jealously guarded by the courts."). Although the evidence against defendants may be weighty, we do not believe that it rises to the level whereby we would deem the denial of this fundamental right to be "harmless." *Cf. A. Kush & Assocs. v. American States Ins. Co.*, 927 F.2d 929, 939 (1991) ("[A]ny error that may result from denying a plaintiff's request for a jury trial is 'harmless if a directed verdict for the defendant would have been warranted.'") (quoting *Laskaris v. Thornburgh*, 733 F.2d

260, 264 (3d Cir.1984)). Accordingly, we find that the district court erred in striking the defendants' jury demand with respect to plaintiffs' breach of contract claim under the LMRA.

█ Because defendants are entitled to a jury trial under the LMRA, we need not and do not address the question whether defendants might also be entitled to a jury on plaintiffs' claims brought pursuant to sections 502(a)(3) and 502(g)(2) of ERISA. *Cf. Sheet Metal Workers Local 19 v. Keystone Heating & Air Conditioning*, 934 F.2d 35, 38–40 (3d Cir.1991) (finding that section 502(a)(3) provides only for equitable relief, but that section 502(g)(2) provides for legal relief and therefore entitled the litigants to a jury trial). To the extent that either of these sections affords legal relief in the form of damages for breach of the relevant CBAs, such relief will be coextensive with the relief available under the LMRA, and any issues common to both claims can be considered by the jury. *See Curtis*, 415 U.S. at 196 n. 11, 94 S.Ct. 1005. To the extent that these sections provide only equitable relief, the existence of a parallel claim in equity will not impair the right to a jury on plaintiffs' legal claim. *See id.; See Stewart v. KHD Deutz of Am. Corp.*, 75 F.3d 1522, 1527–28 (11th Cir. 1996) (where claims under ERISA and the LMRA are joined, the equitable nature of the ERISA claims does not affect the rights of the parties to a jury trial on the LMRA claims); *Senn v. United Dominion Indus., Inc.*, 951 F.2d 806, 813–14 (7th Cir.1992) (same). Moreover, equitable relief is available only if plaintiffs' legal remedies are inadequate; if so, such relief may be awarded by the district court after the jury has had an opportunity to consider plaintiffs' legal claims and any factual determinations common to plaintiffs' legal and equitable claims. *See Dairy Queen*, 369 U.S. at 479, 82 S.Ct. 894 (noting that

"the legal claims involved in the action must be determined prior to any final court determination of respondents' equitable claims"); *Beacon Theatres,* 359 U.S. at 510–511, 79 S.Ct. 948; *LeBlanc–Sternberg v. Fletcher,* 67 F.3d 412, 432 (2d Cir. 1995), *cert denied* 518 U.S. 1017, 116 S.Ct. 2546, 135 L.Ed.2d 1067 (1996); *Zotto,* 1987 WL 49862, at *7; *see also Bugher,* 722 F.2d at 1360.

 Therefore, on remand, the jury will determine all issues bearing on plaintiffs' breach of contract claim, including but not limited to: (1) whether Sandimo adopted by its conduct the unsigned 1990–1993 and 1993–1996 Ready–Mix CBAs; (2) whether any or all of the defendant companies constituted a single employer [2] with

employees constituting a single appropriate bargaining unit, which would require a finding of liability on the part of the companies that did not sign or adopt the relevant CBAs; and (3) whether any or all of the defendant companies were alter egos of one another, requiring a similar finding of liability.[3] The district court will then be free to consider whether any equitable remedies are available under sections 502(a)(3) and 502(g)(2), keeping in mind that such remedies are available only if any legal relief available to the plaintiffs is inadequate. Because "principles of collateral estoppel prevent [a district court] from making findings of fact contrary to those of the jury," *LeBlanc–Sternberg,* 67 F.3d at 432, the district court must heed

---

2. As recognized by the district court, a collective bargaining agreement may be enforced against non-signatory employers if the employers constitute a "single employer" and if the employees of the companies constitute a single appropriate bargaining unit. *See Lihli Fashions Corp. v. NLRB,* 80 F.3d 743, 747 (2d Cir.1996) (per curiam). "Separate companies are considered a 'single employer' if they are 'part of a single integrated enterprise.'" *Id.* (citations omitted). In ascertaining whether a group of companies is a "single employer" for these purposes, we look to four factors, none of which is controlling and not all of which need be present: "[1] interrelation of operations, [2] common management; [3] centralized control of labor functions and [4] common ownership." *Id.* Family connections and the common use of facilities and equipment are also relevant. *See id.* "Ultimately single employer status depends on all the circumstances of the case and is characterized by absence of an 'arms length relationship found among unintegrated companies.'" *Id.* (citation omitted); *see also, e.g., Carpenters Local Union No. 1846 v. Pratt–Farnsworth, Inc.,* 690 F.2d 489, 504–05 (5th Cir.1982). In determining whether the defendants' employees constitute a "single bargaining unit," we look for a "community of interests" among the relevant employees, *see Pratt–Farnsworth* 690 F.2d at 520, and "factors such as bargaining history, operational integration, geographic proximity, common supervision, simi-

larity in job function and degree of employee interchange." *Dominic Prisco Transp. Inc,* No. CV–95–1121 (ADS), 1997 WL 1093463, at *3 (E.D.N.Y.1997).

3. "The alter ego doctrine, while having the same binding effect on a non-signatory as the single employer/single unit doctrine, is conceptually distinct." *Truck Drivers Local Union No. 807 v. Regional Import & Export Trucking,* 944 F.2d 1037, 1046 (2d Cir.1991). "The hallmarks of alter ego doctrine include 'whether the two enterprises have substantially identical management, business purpose, operation, equipment, customers, supervision, and ownership.'" *Id.* (quoting *Goodman Piping Prods., Inc. v. NLRB,* 741 F.2d 10, 11 (2d Cir.1984)) (JLO, JON, Mishler (D.J.)(per curiam)); *see also Lihli,* 80 F.3d at 748. Although the factors used to determine alter ego liability are similar to those relevant to the determination of single employer status, "[t]he focus of the alter ego doctrine ... is on the existence of a disguised continuance or an attempt to avoid the obligations of a collective bargaining agreement through a sham transaction or a technical change in operations." *Lihli,* 80 F.3d at 748 (quoting *Pratt–Farnsworth,* 690 F.2d at 508 (internal quotation marks omitted)). "[A]nti-union animus may be 'germane,' or even a sufficient basis for imposing alter ego status" but "anti-union motivation" is not necessary. *Goodman Piping,* 741 F.2d at 12.

any factual determinations made by the jury in assessing whether equitable relief is required.

■ As guidance to the district court on remand, we note that, contrary to the defendants' argument on appeal, the district court has jurisdiction over the question whether the defendants' employees constitute an appropriate single bargaining unit. Citing *UA Local 343 v. Nor–Cal Plumbing Inc.*, 48 F.3d 1465, 1470–71 (9th Cir.1994), defendants argue that the district court was without jurisdiction to decide this question, and suggest that this issue must be decided by the National Labor Relations Board ("NLRB"). In *Nor–Cal*, the Ninth Circuit relied on *South Prairie Constr. Co. v. Local No. 627, Int'l Union of Operating Eng's*, 425 U.S. 800, 805–06, 96 S.Ct. 1842, 48 L.Ed.2d 382 (1976) (per curiam), to determine that the question whether the relevant employees constituted an appropriate bargaining unit was key to finding liability on the part of non-signatory employers, and that it was a question over which the NLRB had exclusive jurisdiction. *See Nor–Cal*, 48 F.3d at 1470.

We respectfully disagree with our sister circuit's interpretation of *South Prairie*, and with its resulting determination that the district courts are necessarily without jurisdiction to decide the "single bargaining unit" issue. In *South Prairie*, the NLRB had found that two companies did not constitute a single employer. *See South Prairie*, 425 U.S. at 802, 96 S.Ct. 1842. The United States Court of Appeals for the D.C. Circuit reversed the NLRB on that point, and went on to find that the employees of the two companies constituted a single bargaining unit. *See id.* The Supreme Court found that the NLRB had never made a determination on the single bargaining unit issue and that the circuit court did not have jurisdiction to make

that determination in the first instance. *See id.* at 805–06, 96 S.Ct. 1842. It therefore affirmed the circuit court on the single employer issue and remanded the bargaining unit issue to the NLRB. Thus, as recognized by the Fifth Circuit in *Carpenters Local Union No. 1846 v. Pratt–Farnsworth, Inc.*, 690 F.2d 489 (5th Cir.1982), *South Prairie* stands not for the proposition that the NLRB has exclusive jurisdiction over the bargaining unit issue, but rather for the basic principle that an agency should be afforded the opportunity to decide a factual issue before the issue is decided by an appellate court, *see id.* at 514.

In *Pratt–Farnsworth*, the Fifth Circuit recognized that where no application had been made to the NLRB on the issue, and where the determination of the single bargaining unit issue was central to a question of contract interpretation, the bargaining unit issue was appropriate for resolution by the district court. *See id.* at 515–19. The Court found that this was particularly so where "collateral labor law issues arise in the course of an ERISA claim." *See id.* at 519. We have not previously addressed this question. However, district courts in this circuit have explicitly or implicitly followed *Pratt–Farnsworth* and concluded that they had jurisdiction over the bargaining unit issue when it related to a contract interpretation question, although they have at times determined that the NLRB had primary jurisdiction on the facts of the particular cases before them. *See Trustees of the Eastern States Health & Welfare Fund v. Crystal Art Corp.*, No. 00 CIV. 0887(NRB), 2000 WL 1514593 at *4 (S.D.N.Y. Oct.11, 2000); *Local 812 GIPA v. Canada Dry Bottling Co.*, No. 98 CIV 3791(LMM), 1999 WL 301692 at *5 (S.D.N.Y. May 13, 1999); *Bourgal v. Robco Contracting Enters.*, 969 F.Supp. 854, 863 (E.D.N.Y.1997); *Mason Tenders Dist.*

*Council Welfare Fund v. ITRI Brick & Concrete Corp.,* No. 96 Civ. 6754(AJP)(LAK), 1997 WL 678164 at *5 *6 (S.D.N.Y. Oct. 31, 1997). We agree, and find that the district court was not necessarily without jurisdiction to determine whether the defendants employees constituted a single bargaining unit.

Because we remand for a new trial, we need not reach the defendants' remaining arguments.

## CONCLUSION

For the foregoing reasons, we reverse the district court's striking of defendants' jury demand, and remand the case to the district court for a jury trial on plaintiffs' claims for breach of contract under the LMRA.