**MASSACHUSETTS CARPENTERS CENTRAL COLLECTION AGENCY**

v.

**A.A. BUILDING ERECTORS, INC. & KALWALL CORP.**

**No. CIV.A. 98–12288–RGS.**

United States District Court, D. Massachusetts.

July 9, 2002.

Christopher N. Souris, Krakow & Souris, Boston, MA, for Plaintiff.

Mark T. Broth, Devine, Millimet & Branch, Linda M. Foulsham, Devine, Millimet & Branch, P.C., William R. Bagley, Jr., Devine, Millimet & Branch, Manchester, NH, for Defendants.

*MEMORANDUM AND ORDER ON DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS AND CROSS–MOTIONS FOR SUMMARY JUDGMENT*

STEARNS, District Judge.

On November 10, 1998, the Massachusetts Carpenters Central Collection Agency (MCCCA), a multi-employer pension fund administrator, filed this Complaint under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1145 and § 1132(g), and Section 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185, against A.A. Building Erectors, Inc. (AA Building), and Kalwall Corporation (Kalwall), seeking to enforce the terms of a collective bargaining agreement (CBA) between the United Brotherhood of Carpenters & Joiners of America (UBC) and AA Building. Kalwall and AA Building are owned by Robert Keller and his four sons, who also own several other affiliated companies (collectively the Keller Group). The MCCCA alleges that AA Building is the alter ego of Kalwall and that Kalwall is therefore bound by the CBA to which AA Building is a party. The CBA requires AA Building to use union labor on all of its Massachusetts construction sites and to make pension fund contributions based on the number of hours its union employees work. Under the terms of the CBA, if an employer like AA Building uses non-union labor, either directly or by hiring a subcontractor, it must make pension payments on the same basis as if it had used union workers in the

first instance. The MCCCA alleges that Kalwall, under the so-called "alter ego" doctrine, is liable for pension contributions that should have been made on behalf of its non-union workers.

On November 8, 2001, the MCCCA filed a motion for partial summary judgment on its claim that AA Building and Kalwall meet the alter ego test of *Mass. Carp. Cent. Coll. Agency v. Belmont Concrete Corp.*, 139 F.3d 304 (1st Cir.1998). Kalwall responded with a cross-motion for summary judgment contending the obverse.[1] On November 30, 2001, AA Building and Kalwall moved for judgment on the pleadings, arguing that the court lacked subject matter jurisdiction. The court heard oral argument on April 4, 2002.

AA Building and Kalwall, in their motion for judgment on the pleadings, challenge the standing of the MCCCA because it is not a plan "participant, beneficiary, or fiduciary" as required by ERISA, 29 U.S.C. § 1132(a)(3)(ii). That the MCCCA is not a plan "participant [or] beneficiary" is not a matter of dispute. The MCCCA, however, contends that it meets the statutory definition of a fiduciary.[2]

> [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan. Such term includes any person designated under section 1105(c)(1)(B) of this title.

29 U.S.C. § 1002(21)(A). Defendants argue that the MCCCA is not a fiduciary because it described itself in the complaint as follows.

> Plaintiff, the Massachusetts Carpenters Central Collection Agency (hereinafter "the MCCCA"), is an agency established by the Massachusetts Carpenters Pension Fund which has been designated by the trustees of the Massachusetts State Carpenters Pension Fund, the trustees of the Massachusetts State Carpenters Annuity Fund, the trustees of the Massachusetts Carpenters Training Fund, the trustees of the Massachusetts Carpenters Advancement Program, the trustees of each and every health and welfare fund, apprenticeship fund and promotional fund (hereinafter "the Funds") affiliated with a Massachusetts Carpenters local union of the United Brotherhood of Carpenters & Joiners of America to collect all monies owed to the trustees of the Funds and to conduct audits on behalf of the trustees of the Funds.

Complaint, ¶ 4.

The MCCCA maintains that its failure to plead its fiduciary authority over Plan assets should not be deemed fatal. The MCCCA relies in this regard on the affidavit of its Executive Director, Harry Dow, attesting that the Trustees of the subsid-

---

1. AA Building and Kalwall also filed a motion to strike, arguing that some of the MCCCA's supposed undisputed facts were not properly supported by record citations. The motion will be *DENIED* in part. The court will only consider admissible evidence properly supported by the record.

2. The MCCCA argues persuasively that dismissal of the complaint in its entirely would be inappropriate because section 301 of the LMRA, 29 U.S.C. § 185, imposes no requirement that a plaintiff be a fiduciary in order to bring suit.

iary pension funds have designated the MCCCA as their agent in all matters related to the collection of delinquent contributions. As part of this agency, the MCCCA has been granted discretionary authority over Plan assets. *See Beddall v. State Street Bank & Trust Co.*, 137 F.3d 12, 18 (1st Cir.1998) (a fiduciary is one who "exercises discretionary authority in respect to, or meaningful control over, an ERISA plan, its administration or its assets"). As a precautionary measure, the MCCCA has also moved to amend the complaint to add the individual Trustees as plaintiffs.[3] The motion to amend is *ALLOWED*.[4] The motion for judgment on the pleadings is, as a result, *DENIED*.

Turning to the cross-motions for summary judgment, the undisputed facts are as follows. In 1951, Robert Keller incorporated Robert R. Keller & Associates, Inc. (RRK), a research and development company.[5] In 1955, Keller established Kalwall to design, manufacture, and sell translucent fiberglass and aluminum panel fenestration systems.[6] In addition to manufacturing the fenestration systems, Kalwall installs them on request. Kalwall, a non-union employer, utilizes only non-union installers.[7]

Some Kalwall customers, however, prefer union installation. For a time, Kalwall responded to these customers by hiring union subcontractors. Kalwall, however, became dissatisfied with the quality of the work and the inability of the subcontrac-

tors to insure a steady supply of union workers. As a result, in 1964, Kalwall created AA Building as a union subsidiary. AA Building became a signatory to the CBA at its inception and has since faithfully made pension contributions to the MCCCA.

AA Building exclusively serves Kalwall customers. AA Building has no clerical managerial, or supervisory employees. AA Building uses Kalwall's telephone number, fax number and office address. AA Building's shareholders, directors, and officers are the same Keller family members who own and control the Keller Group companies. AA Building's installation crews are hired, laid off, recalled, assigned, directed, and supervised by employees of RRK, which also handles AA Building's bookkeeping and payroll.

Kalwall holds itself out as having a "single source capacity from design to installation" with site work performed by "[h]ighly skilled factory teams" employed by AA Building or Kalwall through a subcontractor. Kalwall refers to AA Building in internal and external communications as its "installation department" or "installation manager." AA Building provides its customers with workers' compensation insurance certificates that list Kalwall as the insured. Similarly, Kalwall does not obtain written permission to "subcontract" installation work to AA Building when customers require written outsourcing approval.

---

3. In addition, the MCCCA points out that on January 7, 2002, this case was consolidated with a similar case, 01–CV–12294–RGS, brought by the individual Trustees against AA Building and Kalwall with the understanding that the resolution of the dispositive motions in this case would have a preclusive effect on the earlier case.

4. The court had earlier denied the motion as untimely. On further reflection it will revoke and reverse its January 15, 2002 Order.

5. RRK in its present incarnation provides management and accounting services for the Keller Group.

6. Fenestration is a technical word signifying the design and installation of windows and other apertures in a building's exterior.

7. Kalwall's installers are for the most part provided by its non-union subcontractors, mainly Paul Vallee Construction Co.

When Kalwall's President, Richard Keller, was questioned about "whether [AA Building] was created to avoid labor obligations," he replied as follows:

A. As I understand it, the then Kalwall president and general manager, who's long passed away, saw that Kalwall was not getting all the sales that it should be getting because there were some sites that the general contractor would whisper in the salesperson's ear could only be done if it was installed by a union contractor.

Our then president tried several union installation companies, and all—Not all. We often had either quality or timing problems. So we ended up with unhappy customers. So he convinced my dad in the interest of quality, timely Kalwall product installation when union installation was required by our customers to get the sale to start this company....

Q. Okay. So it was established as a separate company -

A. Absolutely separate.

Q. -rather than having the people on Kalwall's direct payroll -

A. Right.

Q. in order to do certain work on a union basis.

A. Install on a union basis, yeah.

Q. But still permit work to be installed on a nonunion basis.

A. Certainly.

Keller Dep., at 110–111.

## DISCUSSION

Relying on *Belmont Concrete,* the MCCCA argues that the undisputed facts establish that AA Building and Kalwall are alter egos and that Kalwall is therefore bound by AA Building's CBA. In *Belmont,* the Court discussed the legal framework.

On summary judgment, the district court ruled for the plaintiff in a carefully reasoned opinion.... We affirm largely on the basis of the district court opinion, and further discuss the alter ego issue. We do so because this issue frequently arises in suits to hold one company liable for benefit plan contributions another company has contracted to make under the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), Pub.L. 96–364, 94 Stat. 1208 (1980), which amends ERISA, 29 U.S.C. §§ 1001–1461. We also do so to emphasize that the alter ego jurisprudence developed in cases brought under the National Labor Relations Act, 29 U.S.C. §§ 141–197, is applicable in cases brought under ERISA where the basis for imposition of liability is also the alter ego doctrine....

The alter ego doctrine is meant to prevent employers from evading their obligations under labor laws and collective bargaining agreements through the device of making " 'a mere technical change in the structure or identity of the employing entity ... without any substantial change in its ownership or management.' " *NLRB v. Hospital San Rafael, Inc.,* 42 F.3d 45, 51 (1st Cir.1994) (quoting *Howard Johnson Co. v. Hotel Employees,* 417 U.S. 249, 259–61 n. 5, 94 S.Ct. 2236, 2242, 41 L.Ed.2d 46 (1974)). Although the alter ego doctrine is primarily applied in situations involving successor companies, "where the successor is merely a disguised continuance of the old employer," *C.E.K. Indus. Mechanical Contractors, Inc. v. NLRB,* 921 F.2d 350, 354 (1st Cir.1990) (citing *Southport Petroleum Co. v. NLRB,* 315 U.S. 100, 106, 62 S.Ct. 452, 455–56, 86 L.Ed. 718 (1942)), it also applies to situations where the companies are parallel companies. *See Union Builders, Inc. v. NLRB,* 68 F.3d 520, 524 (1st Cir.1995).

In this case, Algar was both parallel to Belmont and successive to Belmont. A finding that two employers are alter egos will bind the nonsignatory to a collective bargaining agreement between the union and the nonsignatory's alter ego. *See Hospital San Rafael,* 42 F.3d at 52–53; *Penntech Papers, Inc. v. NLRB,* 706 F.2d 18, 24 (1st Cir. 1983). . . .

In determining whether a nonsignatory employer is an alter ego of a signatory, we consider a variety of factors, including continuity of ownership, similarity of the two companies in relation to management, business purpose, operation, equipment, customers, supervision, and anti-union animus—i.e., "whether the alleged alter ego entity was created and maintained in order to avoid labor obligations." *Hospital San Rafael,* 42 F.3d at 50; see *C.E.K.,* 921 F.2d at 354. No single factor is controlling, and all need not be present to support a finding of alter ego status. *See Hospital San Rafael,* 42 F.3d at 51. In particular, there is no rule that wrongful motive is an essential element of a finding of alter ego status. *See id.*

*Belmont,* 139 F.3d at 305–308.

The MCCCA argues that Kalwall and AA Building satisfy the *Belmont* test because the two companies share the same ownership, supervision, business purpose, method of operation, and customer base. That Kalwall and AA Building are joined at the hip, and that AA Building is a captive of Kalwall, seems hardly worth a debate, although defendants make a half-hearted stab at the proposition that the two companies lead a wholly separate existence. More convincingly, defendants argue that even if Kalwall and AA Building are conjoined, the alter ego doctrine is not applicable for the simple reason that AA Building was not formed by Kalwall to avoid its obligations under a (non-existent CBA).

Defendants' argument in this respect has considerable force. In *Belmont,* the Court explained that "[t]he alter ego doctrine is meant to prevent employers from evading their obligations under labor laws and collective bargaining agreements through the device of making 'a mere technical change in the structure or identity of the employing entity . . . without any substantial change in its ownership or management.'" *Belmont,* 139 F.3d at 307. Here, we have the reverse. Kalwall is, and always has been, a non-union entity. It has never been bound by a CBA and consequently has never been obligated to make pension contributions to the Plan on behalf of employees. Rather than seeking to avoid such an obligation, Kalwall created AA Building to employ union workers who are Plan participants.[8]

While by no means an easy question, the peculiar facts of this case are at odds with the policy underlying the alter ego doctrine.[9] The purpose of the doctrine is to prevent union employers from using phantom subsidiaries as a means of escaping

---

**8.** There is no allegation that AA Building has failed to make the required pension payments on behalf of its union employees.

**9.** It is perhaps worth stressing that "alter ego" as used in describing this doctrine is a term of ERISA art, and should not be confused with its more familiar usage in corporation, agency, and contract law. A company might be an alter ego of its parent or owner for purposes of determining tort or contractual liability, and yet not be an alter ego for ERISA purposes. *Cf. Pepsi–Cola Metropolitan Bottling Co., Inc. v. Checkers, Inc.,* 754 F.2d 10, 14–16 (1st Cir.1985). As a general proposition, there is nothing inherently suspect in a corporation establishing a wholly owned and thoroughly subordinate subsidiary to carry out a legitimate corporate purpose. *Compare M. McDonough Corp. v. Connolly,* 313 Mass. 62, 65–66, 46 N.E.2d 576 (1943) *with Alman v. Danin,* 801 F.2d 1, 4 (1st Cir.1986).

their obligations under a CBA.[10] In the context of this case, the question is whether Kalwall created AA Building to avoid making contributions to the MCCCA fund on behalf of union workers. The answer is rather self-evident. *See Architectural Iron Workers Local No. 63 Welfare Fund et al. v. United Contractors, Inc. and United Skys, Inc.*, 46 F.Supp.2d 769, 789 (N.D.Ill.1999) ("We find, as did the court in *Favia*, that far from attempting to evade union obligations, the defendants, by creating Contractors and allowing it to become a union shop, were responsible for benefit fund contributions that would not have otherwise been made."). The alter ego doctrine, in short, does not contemplate the case of a non-union employer seeking a lawful means to employ union workers without sacrificing its non-union status.

While one can argue the issue both ways, there are sound reasons for refusing to extend the alter ego doctrine in the way that MCCCA would have it. A ruling in MCCCA's favor would either cause Kalwall to dissolve AA Building, which would result in less union employment, and a smaller pool of contributions to the MCCCA's pension fund, or would force Kalwall's non-union employees out of existing pension arrangements and into the MCCCA's. While the latter purpose is what I assume the MCCCA is seeking to accomplish, the result would be unfair to employees who have not sought union protections or benefits, while the dissolution of AA Building would be harmful to the union workers that it now employs.[11] The result might be different if the labor laws were intended by Congress to favor unions over management, or union over non-union employees, or CBAs over individual employment contracts, but such is not the case. See 29 U.S.C. § 141; *see also Wagor v. Cal Kovens Constr. Corp.*, 382 F.2d 813, 815 (5th Cir.1967).

### ORDER

For the foregoing reasons, the MCCCA's motion to amend is *ALLOWED.* Defendants' motion to strike is *DENIED* in part. Defendants' motion for judgment on the pleadings is *DENIED.* The MCCCA's motion for summary judgment is *DENIED.* Defendants' cross-motion for summary judgment is *ALLOWED.*

SO ORDERED.

---

**10.** In implementing the test of the doctrine, courts often look to the issue of whether anti-union animus motivated the employer in creating a non-union subsidiary. *See, e.g., Pension Welfare and Vacation Fringe Ben. Funds of IBEW Local 701 v. Favia Elec. Co.*, 995 F.2d 785, 789 (7th Cir.1993). The MCCCA's argument that the deposition testimony of Kalwall's president betrays an anti-union animus is an unfair reading of what he actually said. The most that the quoted portions of his testimony reveal is Kalwall's thought processes and reasoning in establishing a separate union shop, fully recognizing that in doing so, the new company would be required to assume the obligations of the CBA.

**11.** The MCCCA might hope that Kalwall will simply succumb to the rules of the CBA, but this seems unrealistic.