Jason HUNTER, Plaintiff,

v.

YOUTHSTREAM MEDIA NETWORKS, INC., Network Event Theater, Inc., Common Places, LLC, Defendants.

No. CIV.A.01–10659–RBC [1].

United States District Court, D. Massachusetts.

Dec. 5, 2002.

---

1. With the parties' consent, this case has been referred and reassigned to the undersigned for all purposes including trial and the entry of judgment pursuant 28 U.S.C. § 636(c).

Paul M. Rezendes, Nelson P. Lovins, Levins & Metcalf, Woburn, MA, for Plaintiff.

David C. Aisenberg, Looney, Cohen, Reagan & Aisenberg, Looney, Cohen, Reagan & Aisenberg, Boston, MA, for Defendants.

### MEMORANDUM AND ORDER ON MOTION OF THE PLAINTIFF FOR AN INJUNCTION IN THE NATURE OF EQUITABLE ATTACHMENT, PURSUANT TO FED. R. CIV. P. 64(# 67)

COLLINGS, United States Magistrate Judge.

### I. Introduction

Plaintiff Jason Hunter ("Hunter") has filed a motion requesting that the Court enjoin defendant YouthStream Media Networks, Inc. ("YouthStream") to hold three hundred thousand dollars ($300,000.00) in cash and assets as security for the judgment Hunter expects to recover in this action. (# 67) In support of his motion the plaintiff has submitted a memorandum of law (# 68), proposed findings and rulings under Fed.R.Civ.P. 52(a)(# 69), and a three volume appendix of exhibits. (# 70–2) YouthStream has filed an opposition to the motion for equitable attachment with supporting exhibits (# 75) as well as a declaration of its corporate counsel with exhibits. (# 76)

In response to a Procedural Order (# 79) issued on October 29, 2001, Hunter filed a supplemental memorandum on the

issue of the availability of an equitable attachment in the state court. (# 82) On November 19, 2002, YouthStream filed a supplemental response to the plaintiff's submission. (# 83) At this juncture the record is now complete. Having thoroughly reviewed the parties' submissions, the Court finds that Hunter's motion is amenable to disposition on the papers with some degree of dispatch.

There are two contracts at issue in this litigation. The first is a written agreement of merger executed on or about October 15, 1999, pursuant to the terms of which defendant Network Event Theater, Inc. ("NET") acquired all the shares of stock of Invino Corporation, a company founded and partially owned by Hunter. (Amended Complaint # 28 ¶ 15; Answer # 27 ¶ 15) The second, also signed on or about October 15, 1999, is a three-year employment agreement between Hunter and defendant Common Places, LLC ("Common Places"). (# 28 ¶ 26 and Exh. B; # 27 ¶ 26) The crux of the plaintiff's amended complaint is that NET and Common Places have breached these contracts, respectively. YouthStream is said to have exercised pervasive control over the other two defendants and assumed the performance of these contracts such that it, too, is liable for the alleged breaches.[2]

■ Although discovery is yet ongoing,[3] Hunter is now moving under Rule 64, Fed. R.Civ.P., for an equitable attachment against the liquid assets of YouthStream to secure the favorable judgement he anticipates receiving from the jury. To be entitled to such an injunction in this Circuit, the plaintiff must satisfy the very familiar four-prong test set forth in *Planned Parenthood League of Massachusetts v. Bellotti*:

The Court must find: (1) that plaintiff will suffer irreparable injury if the injunction is not granted; (2) that such injury outweighs any harm which granting injunctive relief would inflict on the defendant; (3) that plaintiff has exhibited a likelihood of success on the merits; and (4) that the public interest will not be adversely affected by the granting of the injunction.

*Planned Parenthood*, 641 F.2d 1006, 1009 (1st Cir.1981) quoting *Women's Community Health Ctr., Inc. v. Cohen*, 477 F.Supp. 542, 544 (D.Me.1979); accord *Suarez–Cestero v. Pagan–Rosa*, 172 F.3d 102, 104 (1 Cir., 1999).

## II. Equitable Attachment Under Massachusetts Law

### A. Common Law

■ Hunter claims to be entitled to an equitable attachment under the common law of the Commonwealth. According to the plaintiff, a judgment is no longer required in Massachusetts for an equitable injunction to issue. Rather, Hunter argues all that is necessary is that he "show that his remedies at law have been exhausted without providing relief, or that resort to a legal remedy would be futile." (# 82 at 4, emphasis in original) While the principle may be valid, the cases make clear that it is applied in extremely limited circumstances not present in the instant case.

The principle appears in a 1907 case decided by the Supreme Judicial Court ("SJC"), *Maguire v. Spaulding*, 194 Mass. 601, 604, 80 N.E. 587 (1907) in which lienors sued to enforce their liens as to which "the amounts due were determined [but] they never were prosecuted to final judgment..." *Maguire*, 194 Mass. at 603, 80

---

**2.** Needless to say the defendants dispute Hunter's allegations.

**3.** Discovery is not scheduled to be completed until January 31, 2003. (See # 66)

N.E. at 587. What occurred was that the property was sold under foreclosure proceedings, and after satisfying the mortgagor, the mortgagee had a surplus. The surplus was attached by a creditor of the mortgagee who claimed those who had liens on the property did not have a claim to the surplus superior to his because the lienors had never reduced their liens to judgment. *Id.*

On these facts, the SJC wrote:

We assume as the complainant contends that the bill is brought under the general equity powers of the court [and not under a statute], and that generally speaking in order to maintain such a bill must appear that the claim has gone to judgment and execution (*Carver v. Peck*, 131 Mass. 291); but the rule is not an absolute one, and does not apply where a judgment and execution would be of no practical utility. *Case v. Beauregard*, 101 U.S. 688, 11 Otto 688, 25 L.Ed. 1004 (1879). Manifestly in the present case an order of sale would have accomplished nothing and would have been a useless formality.

*Maguire*, 194 Mass. at 604, 80 N.E. at 587.

Thus, the SJC ruled that the lienors had a superior claim to the surplus. The important point for present purposes is that what had been determined in the proceedings to enforce the liens were the amounts due to the lienors. In the present case, there are no liens involved, and there has been no determination as to what, if anything, is owed by YouthStream to the plaintiff.

In *First National Bank of Boston v. Nichols*, 294 Mass. 173, 200 N.E. 869 (1936), the plaintiff bank filed a petition in the probate court seeking the entry of an order directing the executors of a certain individual's will to retain adequate monies as security for the payment of a claim by the bank against the estate. A statute permitted the probate court to issue such an order upon the petition of a "...creditor of the deceased whose right of action does not accrue within one year after the giving of the administration bond... [and] upon examination thereof, the court finds that such claim is or may become justly due from the estate." Mass. Gen. L. c. 197, § 13.[4] The probate court granted the requested order, and the executor appealed. The SJC upheld the probate court's decision.

The first distinction between that case and this is that in First National Bank, there was a statute authorizing the setting aside of funds; the statute is plainly inapplicable to the instant case. However, in the First National Bank case, the executor argued that the bank could have brought its claim within one year after the "giving of the administration bond" and, therefore, the statute did not apply.

The claim which the bank had was based on federal law, so the SJC had to examine whether, under federal law, the bank's claim could have been brought within one year. *First National Bank*, 294 Mass. at 179, 181, 200 N.E. at 872-3. The SJC noted that the executor's argument "...proceeds on the ground that the right under this Federal statute to bring a 'bill in equity, in the nature of a creditor's bill'...could have been brought within the one year time period." *First National Bank*, 294 Mass. at 180, 200 N.E. at 873. The SJC held that the claim could not have been brought because it had not matured. *First National Bank*, 294 Mass. at 183, 200 N.E. at 875.

It was in this connection that the SJC reviewed the law with respect to "an ordinary creditor's suit brought under general

---

4. The statute remains on the books without apparent change.

equity jurisdiction to reach and apply equitable assets of a debtor in payment of his debts." *First National Bank*, 294 Mass. at 182, 200 N.E. at 874. The Court first noted that "...the 'true rule in equity is that under usual circumstances, a creditor's bill may not be brought except by a judgment creditor after a return of 'nulla bona' on an execution'." *First National Bank*, 294 Mass. at 182, 200 N.E. at 874 .quoting *Harkin v. Brundage*, 276 U.S. 36, 52, 48 S.Ct. 268, 72 L.Ed. 457 (1928). It then added:

> though it was said in the case of *Case v. Beauregard*, 101 U.S. 688, 690, 691, 11 Otto 688, 25 L.Ed. 1004 (1879) that 'it has been decided that where it appears by the bill that the debtor is insolvent and that the issuing of an execution would be of no practical utility, the issuance of an execution is not a necessary prerequisite to equitable interference,' and that 'whenever a creditor has a trust in his favor, or a lien upon property for the debt due him, he may go into equity without exhausting legal processes or remedies.' But even if the statutory bill in equity can be brought without a judgment against the bank first having been obtained [citations omitted] by analogy to the situation where the debtor is insolvent or the 'creditor has a trust in his favor, or a lien on the property for the debt due him', it does not follow that such a bill in equity can be brought by a person whose claim cannot be proved because both unmatured and contingent.

*First National Bank*, 294 Mass. at 183, 200 N.E. at 874.

This is not to suggest that Hunter's claims, unlike those of the bank, are "unmatured" or "contingent." Rather, if it is assumed that the SJC's discussion of the law with respect to when a creditor's bill can brought is a discussion of Massachusetts (as opposed to federal law), the exceptions to the general rule that a judgment is a prerequisite to bring a creditor's bill are very narrow, i.e., "where the debtor is insolvent or the 'creditor has a trust in his favor, or a lien on the property for the debt due him.'" Hunter falls within none of these narrow exceptions. He has no lien, no trust in his favor, and he has not proven that YouthStream is insolvent.

In the case of *Foster v. Evans*, 384 Mass. 687, 429 N.E.2d 995 (1981), the SJC carved out another narrow exception. The issue was whether the Probate Court had jurisdiction "to entertain a creditor's suit to reach property fraudulently conveyed by a judgement debtor and to apply that property toward satisfaction of a Superior Court judgment." *Foster*, 384 Mass. at 688, 429 N.E.2d at 996. As did the Nichols court before it, the SJC acknowledged that it was not essential to pursuing an equitable creditor's bill that the creditor have a judgment; "[t]he rule requiring both a judgment and unsatisfied execution, however, 'is not an absolute one, and does not apply where a judgment and execution would be of no practical utility.'" *Foster*, 384 Mass. at 693, 429 N.E.2d at 999 (citation omitted).

However, the creditor in Foster possessed both a judgment and an execution, so that the amount due and owing had been determined. While the creditor did not possess a judgment on the claim of fraudulent conveyance, the SJC held that:

> ...a plaintiff who has obtained a judgment at law against a debtor, and who alleges that the judgment cannot be satisfied because the debtor has fraudulently transferred his assets to a third party, has stated a case which is cognizable under the general principles of equity jurisprudence.

*Foster*, 384 Mass. at 694, 429 N.E.2d at 999.

This holding plainly is inapplicable to the case at hand; Hunter does not have a judgment and has not shown that there has been any fraudulent transfers.

Lastly, the plaintiff points to the case of *In re Rare Coin Galleries of America, Inc.*, 862 F.2d 896 (1st Cir.1988) to show that the pre-judgment equitable attachment he now seeks would be available to him in a Massachusetts state court. The bankruptcy trustee for the debtor had sought and received a preliminary injunction in the district court against the defendant accountants and their insurer enjoining the insurer from using in any way the proceeds of the liability policy it had issued to the accountants and allowing the trustee to reach and apply the proceeds of that policy to satisfy the anticipated judgment against the accountants. In discussing the second part of the injunction, the First Circuit wrote as follows:

> Massachusetts law provides for two types of bills to reach and apply. The first type is a traditional remedy available to judgment creditors who have been unable to execute on the defendant's assets. There is an exception: the plaintiff need not obtain a judgment first if the defendant is insolvent. This remedy is not available in the instant case because the trustee has not obtained a judgment nor has he made any showing that [the accountants are] insolvent.

*In re Rare Coin Galleries of America, Inc.*, 862 F.2d at 903–4 (citations omitted; emphasis in original).

■ As stated, supra, Hunter has made no showing of insolvency.[5] Since he has not made a showing that he lacks an adequate remedy at law, he is not entitled to relief under the general equity powers of the court.

**B. Statutory Law**

■ Massachusetts General Laws chapter 214, § 3(6) is the reach and apply statute in the Commonwealth. Under this statute

> the court must engage in a two-step process to establish (1) the indebtedness of the defendant and (2) the defendant has property that can be reached by the plaintiffs in satisfaction of the defendant's debt. M.G.L. c. 214 §§ 3(6) and (7); *Papamechail v. Holyoke Mut. Ins. Co.*, 8 Mass.App.Ct. 849, 397 N.E.2d 1153, 1156 (1979).

*General Motors Acceptance Corp. v. Camilleri Bros. Chevrolet of Holyoke, Inc.*, 188 F.Supp.2d 73, 76 (D.Mass.2002); *Foster*, 384 Mass. at 692, 429 N.E.2d at 998.

The two-step procedure has been limned more fully as follows:

> The first step is in the nature of an action at law and requires the plaintiff to establish the debt owed by the principal defendant to the plaintiff. *Massachusetts Electric Company v. Athol One, Inc.*, 391 Mass. 685, 462 N.E.2d 1370, 1372 (Mass.1984) ("in the first step," the plaintiff must show the existence of a debt owed to the plaintiff by "the principal defendant"); *Stockbridge v. Mixer*, 102 N.E. at 647 (first step "is the establishment of an indebtedness on the part of the principal defendant to the plaintiff").

> \*      \*      \*      \*      \*      \*

> "The second step involves the process of satisfying the debt," . . . "out of the property held by one who owes a debt to the principal defendant." *Massachusetts Electric Company v. Athol One, Inc.*, 391 Mass. at 687, 462 N.E.2d 1370 . . . Under chapter 214, the plaintiff

---

**5.** That YouthStream's finances may be "di-  cey" does not prove insolvency.

"must show that this property, by its nature, is incapable of attachment or of taking on execution in a legal action." *Massachusetts Electric Company v. Athol One, Inc.,* 391 Mass. at 688, 462 N.E.2d 1370. Indeed, section 3(6) of chapter 214 describes the debtor's debt to the third party as one "which cannot be reached to be attached or taken on execution." Mass. Gen. L. ch. 214, § 3(6).

\* \* \* \* \* \*

*Trustees v. Baldwin Steel Co., Inc.,* 2001 WL 1555539, \*3–\*5 (D.Mass.2001).

The plaintiff falters at the threshold statutory prerequisite.

Hunter notes that in distinguishing a statutory reach and apply action from a common law creditor's bill in equity, the SJC observed that in a reach and apply action it was not incumbent upon the creditor to "reduce his claim to judgment or exhaust his legal remedies." *Foster,* 384 Mass. at 692, 429 N.E.2d at 998. He must, however, establish an indebtedness of a defendant.

The early case of *H.G. Kilbourne Co. v. Standard Stamp Affixer Co.,* 216 Mass. 118, 119, 103 N.E. 469, 469 (1913) was "a suit to reach and apply property of the defendant in payment of an alleged debt in the nature of damages arising from the breach of a contract." The Court noted at the outset that there was no liquidated damages clause in the contract and that the damages were "undetermined". The issue was whether such damages could be considered to be a debt within the meaning of a predecessor reach and apply statute. The SJC concluded "that the word 'debt' in the statute as now amended is not to include all actions founded upon a contractual liability, but only debts as distinguished from mere claims for damages." *Kilbourne,* 216 Mass. at 119, 103 N.E. at 470.

The First Circuit has analyzed the Kilbourne holding:

In Kilbourne the court held that under an earlier version of 3(6) the term "debt", although broadly construed, did not include a pending breach of contract suit not reduced to judgment:

"The word 'debt' has never been made to include the simple possibility of being responsible in damages for the breach of an executory contract where neither the fact of liability nor the amount can be held affirmatively to exist until a judgment shall have been recovered."

*Kilbourne,* 216 Mass. at 122, 103 N.E. at 471. The instant action contains a breach of an unexecuted contract claim as well as tort and statutory claims, but there appears to be no reason why this rule would not extend to such actions as well.

*In re Rare Coin Galleries of America, Inc.,* 862 F.2d at 904.

The First Circuit's conclusion would appear to foreclose the plaintiff's request for an injunction. However, Hunter argues that "the Court's language . . . is not a correct statement of Massachusetts law because that law . . . does not require all contract claims to be reduced to judgment before statutory reach and apply is available." (# 82 at 11) Perhaps it does not require that all be, but it certainly requires that contract claims such as Hunter brings be reduced to judgment before a "debt" is established, since whether liability exists on the part of the defendants is hotly contested and there are disputed issues of fact which must be resolved.

### III. Likelihood of Success on the Merits

In addition to showing a "debt" in the first step of the statutory reach and apply process, Hunter must also establish

that that debt is owed to him from a defendant. It is important to bear in mind that by means of the present motion Hunter is seeking relief against YouthStream. In other words, the plaintiff must show that it is YouthStream that owes the debt, not Common Places which was the contracting party. To hold YouthStream liable for the alleged breaches of the two contracts to which it was not a party, it is incumbent upon the plaintiff to demonstrate that the corporate disregard doctrine applies. Thus, Hunter must establish that he has a likelihood of succeeding in proving that the corporate veil between YouthStream and NET and/or Common Places should be pierced. On the record currently before the Court, the plaintiff has failed to carry his burden.

Nearly thirty-five years ago the Massachusetts Supreme Judicial Court set forth the parameters of the corporate disregard doctrine in the Commonwealth:

> The circumstances in which one corporation, or a person controlling it, may become liable for the acts or torts of an affiliate or a subsidiary under common control have been frequently discussed. Although common ownership of the stock of two or more corporations together with common management, standing alone, will not give rise to liability on the part of one corporation for the acts of another corporation or its employees, additional facts may be such as to permit the conclusion that an agency or similar relationship exists between the entities. Particularly is this true (a) when there is active and direct participation by the representatives of one corporation, apparently exercising some form of pervasive control, in the activities of another and there is some fraudulent or injurious consequence of the intercorporate relationship, or (b) when there is a confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting.

> \* \* \* \* \* \*

> It may be, as one commentator suggests (see Peairs, Business Corporations ss 8—10, esp. at p. 33), that Massachusetts has been somewhat more 'strict' than other jurisdictions in respecting the separate entities of different corporations... Where there is common control of a group of separate corporations engaged in a single enterprise, failure (a) to make clear which corporation is taking action in a particular situation and the nature and extent of that action, or (b) to observe with care the formal barriers between the corporations with a proper segregation of their separate businesses (*see Acton Plumbing & Heating Co. v. Jared Builders, Inc.*, 368 Mich. 626, 628—630, 118 N.W.2d 956 (1962)), records, and finances, may warrant some disregard of the separate entities in rare particular situations in order to prevent gross inequity.

*My Bread Baking Co. v. Cumberland Farms, Inc.*, 353 Mass. 614, 618–20, 233 N.E.2d 748, 751–2 (1968) (footnotes omitted).

The First Circuit has identified numerous factors considered by courts when undertaking an analysis of whether the corporate disregard doctrine should be applied:

> insufficient capitalization for purposes of the corporate undertaking, nonobservance of corporate formalities, nonpayment of dividends, insolvency of the corporation at the time of the litigated transaction, siphoning of corporate funds

by the dominant shareholders, nonfunctioning of officers and directors other than the shareholders, absence of corporate records, use of the corporation for transactions of the dominant shareholders, and use of the corporation in promoting fraud.

*Pepsi–Cola Metropolitan Bottling Co., Inc. v. Checkers, Inc.*, 754 F.2d 10, 15–6 (1 Cir., 1985); accord *Evans v. Multicon Construction Corporation*, 30 Mass.App.Ct. 728, 732–3, 574 N.E.2d 395, 398 (1991).

Even more recently the First Circuit has described the inquiry to be undertaken when probing the corporate separateness of companies as "highly fact-specific" including "consideration of the extent to which a subsidiary may have disregarded corporate formalities; the degree of control exercised by the parent over the day-to-day operations of the subsidiary; overlap in ownership, officers, directors, and personnel; and whether the subsidiary was adequately capitalized." *De Castro v. Sanifill, Inc.*, 198 F.3d 282, 284 (1st Cir. 1999).

The totality of the evidence to which Hunter points as support for his position is as follows:

> [YouthStream] had pervasive control over the affairs of CommonPlaces through its officer, James "PT" Lucchesi. Palmer[6] testified that Lucchesi, although not an officer of CommonPlaces, was his "boss" who was involved in all major decisions concerning CommonPlaces in a manner going beyond the ordinary control that a parent corporation exercises through corporate means. App Exh. C, Palmer Demo Vol III, pp. 68:12–70:9. Lucchesi made the decision that CommonPlaces would not pay its engineers any bonuses at the end of

2000. App Exh. C, Palmer Demo Vol III, pp. 52:11–24. Lucchesi signed the April 4, 2001 letter on YouthStream Media Networks, Inc. letterhead, terminating Hunter as of April 24, 2001, just as he signed the April 23, 2001 letter to Hunter attempting to rescind the April 4 termination, using YouthStream Media Networks, Inc. letterhead. App Exh. E, Demo Exh 10; App Exh. C, Palmer Demo Vol III, pp. 3–24. Palmer's deposition and the affidavit of Hunter submitted in opposition to YouthStream's (withdrawn) motion to dismiss demonstrate that YouthStream allowed CommonPlaces to operate in a manner that was calculated to lead people to believe that in dealing with CommonPlaces they were dealing with YouthStream. App Exh. B; App Exh. C, Palmer Demo, Vol. IV, pp. 81:21 to 88:23.

Memorandum In Support # 68 at 18.

The defendant proffers the declaration of its counsel to counter the plaintiff's showing. In her affidavit, the Senior Vice President and General Counsel of YouthStream, Thea A. Winarsky, states as follows:

> YouthStream was and is a New York-based publicly traded holding company. During fiscal 2002 (July 1, 2001—June 30, 2002) and until August 5, 2002, its various subsidiaries were in the business of selling various media products and services, and retail products. On August 5, 2002, YouthStream sold substantially all of its media operations. The company continues to operate its retail operations. . . .
>
> CommonPlaces was a Massachusetts-based business engaged in providing Internet services and later acted as an application services provider. YouthStream should not be treated as one and

---

**6.** Mark Palmer was the president and CEO of Sodalis, the d/b/a for Common Places, which was a wholly owned subsidiary of Youth-Stream. (Appendix # 71, Exh. C at pp. 21–3) Mr. Palmer was the designated Rule 30(b)(6) deponent for all three defendants.

the same with CommonPlaces for purposes of enforcing the Employment Agreement. The two companies are separate entities, as CommonPlaces was at all relevant times a Delaware limited liability company and YouthStream a Delaware corporation. While CommonPlaces was in operation, the companies had separate management and maintained separate corporate identities in all material respects.

YouthStream did not assume, nor was it assigned, the obligations of CommonPlaces under Hunter's Employment Agreement.

Declaration of Thea A. Winarsky # 76 ¶¶ 7, 8.

While it is true that Hunter's evidence portends some indicia of control by YouthStream over Common Places, it is not indicative of a "rare particular situation" where the distinction between the entities should be ignored. The primary stumbling block, quite simply, is that basically a dearth of information has presented with respect to the majority of the key considerations to be weighed. For example, was Common Places adequately capitalized? Were corporate formalities observed? Did the respective officers and directors perform different functions? Was Common Places used to perpetrate a fraud? Moreover, at least to this point, the plaintiff's evidence is balanced by the evidence offered by the defendants. Given the current state of the record which, with discovery still ongoing, is underdeveloped, it cannot be said that the plaintiff is likely to succeed in establishing that the corporate veil should be pierced.[7] Having failed to establish his likelihood of success on this issue, Hunter's motion for an injunction/attachment is unavailing.

### IV. Conclusion and Order

For the all of the reasons stated it is ORDERED that the Motion Of The Plaintiff For Injunction In The Nature Of Equitable Attachment, Pursuant To Fed. R.Civ.P. 64(# 67) be, and the same hereby is, DENIED.

---

7. The First Circuit has observed that [s]everal courts and commentators have suggested that it should be more difficult to pierce the veil in a contract case than in a tort case. We have found not Massachusetts Supreme Judicial Court case applying the veil piercing doctrine in a contract case. The Appeals Court cases that do so have not addressed the question of whether it is more difficult to pierce the corporate veil in contract than in tort.

*Birbara v. Locke,* 99 F.3d 1233, 1238 (1st Cir.1996).
As in the Birbara case, because Hunter has not demonstrated a likelihood of meeting the My Bread standard, there is no reason to address the question of whether the corporate disregard doctrine is even available in this contract case.