# United States Court of Appeals

## For the First Circuit

No. 03-1056

INTERGEN N.V.,
Plaintiff, Appellee,

v.

ERIC F. GRINA, ALSTOM (SWITZERLAND) LIMITED, AND ALSTOM POWER NV,
Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Robert E. Keeton, U.S. District Judge]

Before

Selya, Circuit Judge,
Stapleton* and Baldock,** Senior Circuit Judges.

John M. Townsend, Hughes Hubbard & Reed LLP, Barry Y. Weiner, Christopher P. Litterio, and Ruberto, Israel & Weiner, P.C. on brief for appellants.
Evan Slavitt, Bodoff & Slavit LLP, George Anthony Smith, Thomas Philip Wilson, and Sutherland Asbill & Brennan LLP on brief for appellee.

September 22, 2003

---

*Of the Third Circuit, sitting by designation.
**Of the Tenth Circuit, sitting by designation.

**SELYA**, <u>Circuit Judge</u>. This case invites us to fit a complex set of corporate pegs into a series of unfamiliar holes drilled by international conventions and federal statutes. But the pegs are square, the holes are round, and the fit is inexact. Given the facts of this case, the obvious bar to arbitrability is the abecedarian tenet that a party cannot be forced to arbitrate if it has not agreed to do so. The defendants advance several theories designed to circumvent this tenet. After answering a question of first impression in this circuit as to what legal standard controls in cases brought under chapter 2 of the Federal Arbitration Act (FAA), 9 U.S.C. §§ 201-208, we examine these theories. In the end, we discern no sufficient legal basis for compelling arbitration here. Consequently, we uphold the order entered below.

## I. BACKGROUND

We divide our discussion of the relevant background into three segments. Except as otherwise indicated, the facts are not disputed.

### A. The Cast of Characters.

Plaintiff-appellee InterGen N.V. is an energy company based in the Netherlands. InterGen finances and develops electric power generation facilities throughout the world. During the summer and fall of 1995, InterGen launched the 750-megawatt Rocksavage power project, located in the United Kingdom. In its

preliminary workup, InterGen entertained competitive bids for gas-fired turbines. After consulting with its technical services advisor and corporate cousin Bechtel Power Corporation, InterGen settled on GT26 gas turbines manufactured by defendant-appellant ALSTOM Power N.V. One persuasive attribute of the successful bid, InterGen alleges, was the manufacturer's pledge to vet the GT26 technology at a special testing facility in Birr, Switzerland. Shortly after choosing the GT26 gas turbines for the Rocksavage plant, InterGen decided to go forward with another electronic power generation facility — Coryton, also located in the U.K. — and opted to use the same turbines there.

Both the Rocksavage and Coryton developments were encased in individual Cayman Island corporations, namely, Rocksavage Power Company (RPC) and Coryton Energy Company (CEC). Both corporations were beneficially owned by another Cayman Islands corporation, International Generating Company (a wholly owned subsidiary of InterGen).[1] In exchange for developing the projects, making key design decisions (such as the selection of the turbines), and infusing capital, InterGen received an equity stake in each project.

_____

[1]The record indicates that InterGen and its panoply of subsidiaries have undergone frequent corporate transformations since 1995 (when this tale began). None of those developments alters the underlying reality: the Rocksavage and Coryton projects have at all times been owned and controlled by InterGen or entities under its direct or indirect suzerainty.

Bechtel Power also has numerous corporate relatives.  The patriarch is Bechtel Group, Inc., and Bechtel Power, Bechtel Limited, and Bechtel Enterprises Energy B.V. (one of InterGen's parent companies) are all part of the family.  The specific nature of the ties among the Bechtel entities need not concern us.  What does matter is that Bechtel Power had an ongoing relationship as Intergen's technical services advisor during construction and development of the Rocksavage and Coryton projects.  Another Bechtel company — Bechtel Limited — entered into a separate contract with RPC to act as the engineering, procurement, and construction (EPC) contractor.  Pursuant to that contract, Bechtel Limited negotiated and signed an agreement to purchase turbines and related equipment from an indirectly owned subsidiary of ALSTOM Power, namely, ALSTOM Power Generation (APG).

On June 21, 1996 (some five months after Bechtel Limited and APG executed the Rocksavage purchase order),[2] RPC and APG entered into a services agreement through which APG would maintain the turbines, and a support agreement in which APG promised to deliver certain technology upgrades and risk protection.  CEC and APG entered into a similar support agreement on the same date that Bechtel Limited and APG signed the Coryton purchase order (June 5,

---

[2]The defendants suggest that the parties at some point amended the Rocksavage purchase order to substitute Bechtel Power for Bechtel Limited.  Appellants' Br. at 15-16.  We need not determine whether this amendment in fact occurred, as such a change, in and of itself, would not affect our analysis.

1998).  Each of these five contracts — the two purchase orders, the services agreement, and the two support agreements — contained liquidated damages provisions and specified that English law would govern disputes arising thereunder.  Each also contained clauses providing for mandatory arbitration.

The arbitration clauses in the two purchase orders are identical; in terms, each clause applies to "[a]ny and all controversies, disputes or claims between Buyer and Seller arising out of or in any way relating to this Agreement," and requires that "any dispute or difference arising out of or in connection with this Agreement, including any question regarding its existence, validity or termination, shall be referred to and finally resolved by arbitration under the rules of the London Court of International Arbitration."  The purchase orders define "Buyer" as "the Bechtel entity shown in the Purchase Order Agreement form"; "Seller" as "the Party who has been awarded the Agreement"; and "Agreement" as meaning the purchase order itself.  The services and support agreements contain similarly worded arbitration provisions.

### B.  **The Underlying Dispute**.

In mid-1998, problems relating to the GT26 turbines started to surface.  InterGen alleges that manufacturing and design defects in the turbines caused (and continue to cause) extensive outages that have prevented the Rocksavage facility from operating at full capacity.  InterGen further alleges that the turbines

commissioned for the Coryton facility (which is not yet in commercial operation) are similarly defective.

Over time, this dissatisfaction led to litigation. On July 20, 2001, InterGen brought suit in a Massachusetts state court. It named as defendants ALSTOM Power, APG (formerly known as ABB Power Generation), ALSTOM Power UK Holdings (an ALSTOM subsidiary that owns APG), and Eric Grina, a Massachusetts resident who allegedly acted as ALSTOM Power's agent for many of the relevant negotiations.[3]

The complaint alleged in substance that InterGen relied on ALSTOM Power's misrepresentations when choosing turbines for the Rocksavage and Coryton projects; that this selection was contingent upon the manufacturer's assurances that the turbines would be adequately tested before their installation on site; that the manufacturer made other, related representations to InterGen; that the ALSTOM interests neither intended to pre-test the GT26 turbines at Birr nor to fulfill their other representations; that InterGen invested substantial amounts of capital in the two projects in reliance on the manufacturer's knowingly false representations; that the turbines failed miserably; and that InterGen suffered

---

[3]The complaint also named as defendants ABB Limited and its wholly owned subsidiary, ABB Asea Brown Boveri, Limited (which controlled APG from 1995 to 2000). On April 19, 2002, the district court dismissed the action as to these defendants for want of in personam jurisdiction. That ruling is not before us and, accordingly, we eschew any further reference to those entities.

-6-

economic losses as a result. The complaint channeled these allegations into six state-law causes of action: intentional deceit, negligent deceit, unfair trade practices, promissory estoppel, tortious interference with advantageous relations, and quantum meruit. The complaint neither sought to recover for breach of contract nor to enforce any contractual right.

## C. **Travel of the Case**.

On October 16, 2001, the defendants removed the action to the federal district court. They posited that the arbitration provisions in the purchase orders and the services and support agreements bound InterGen and that these provisions fell within the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the New York Convention), June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38. Because chapter 2 of the FAA implements the New York Convention, the defendants were able to predicate removal of the action to the federal court on 9 U.S.C. § 205 (allowing removal of any "action or proceeding pending in a State court [that] relates to an arbitration agreement or award falling under the Convention"). On October 26, 2001, the defendants moved to compel arbitration, see id. § 206, and to stay proceedings pending completion of the anticipated arbitration. InterGen opposed these motions, noting that it had neither signed any of the underlying contracts nor agreed to arbitrate the claims asserted in its

-7-

complaint. For essentially the same reasons, it asked that the case be returned to the state court.

On December 19, 2001, the district court addressed the pending motions at a status conference. Remarking the sparseness of the record, the court adjudged all the pending motions premature and denied them without prejudice. It simultaneously ordered the parties to conduct discovery limited to the questions of arbitrability and personal jurisdiction. The parties complied, and a contentious period of pretrial discovery ensued.

On July 31, 2002, InterGen filed an amended complaint as of right. See Fed. R. Civ. P. 15(a). The amended complaint discarded the quantum meruit claim. More significantly, it revised the roster of parties in such a way that no signatory to any agreement that contained an arbitration clause remained as a party; InterGen was the sole plaintiff and ALSTOM Power, ALSTOM (Switzerland) Limited, and Grina were the sole defendants. For ease in reference, we denominate the three remaining defendants, collectively, as "ALSTOM."

In short order, InterGen renewed its motion to remand the case to the state court and ALSTOM renewed its motion to force arbitration. On October 31, 2002, the district court, ruling ore sponte, denied InterGen's motion to remand. The following week, the court issued a rescript in which it denied ALSTOM's motion. The court rested its ruling on the premise that, under the

Constitution, it lacked "authority to compel proceedings in London." InterGen N.V. v. Grina, No. 01-11774, slip op. at 3 (D. Mass. Nov. 6, 2002) (unpublished). The court reasoned that because the motion contemplated an arbitration to be held abroad, the court "ha[d] available to it no means of enforcement," and, thus, was "without authority" to proceed. Id. at 3-4.

A party has the right to appeal immediately from an order denying a motion to compel arbitration. See 9 U.S.C. § 16(a)(1)(C). Availing itself of this option, ALSTOM filed a timely interlocutory appeal. In addressing that appeal, we first memorialize the applicable standard of review; then explain why we depart from the district court's reasoning; and, finally, examine afresh the applicability of the various arbitration clauses.

## II. STANDARD OF REVIEW

The baseline rule is that "abstract questions as to whether particular disputes do (or do not) come within the four corners of an expressly limited arbitration provision are legal in nature." Paul Revere Variable Annuity Ins. Co. v. Kirschhofer, 226 F.3d 15, 18-19 (1st Cir. 2000). Because this case raises questions of that genre, we review the district court's refusal to compel arbitration de novo. Id. at 19. We are not wedded to the lower court's rationale, but, rather, may affirm its order on any independent ground made manifest by the record. See, e.g., Houlton Citizens' Coalition v. Town of Houlton, 175 F.3d 178, 184 (1st Cir.

-9-

1999); <u>Freeman</u> v. <u>Package Mach. Co.</u>, 865 F.2d 1331, 1349-50 (1st Cir. 1988).

## III.  THE DISTRICT COURT'S ANALYSIS

An evaluation of the district court's analysis requires a general understanding of the New York Convention.  The Convention is an international agreement designed "to encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced."  <u>Scherk</u> v. <u>Alberto-Culver Co.</u>, 417 U.S. 506, 520 n.15 (1974).  The United States acceded to this treaty on September 30, 1970.  To implement it, Congress enacted chapter 2 of the FAA.

The arbitration clauses at issue here come within the Convention's ambit.  <u>See</u> <u>generally</u> <u>DiMercurio</u> v. <u>Sphere Drake Ins.</u>, 202 F.3d 71, 74 & n.2 (1st Cir. 2000); <u>Ledee</u> v. <u>Ceramiche Ragno</u>, 684 F.2d 184, 186-87 (1st Cir. 1982).  A district court's duty to enforce arbitration clauses that so qualify cannot seriously be questioned.  <u>See</u> 9 U.S.C. § 201 (directing that the New York Convention "shall be enforced in United States courts").  Article II of the Convention requires contracting states to "recognize an agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen or which may arise between them."  21 U.S.T. at 2519, 330 U.N.T.S. at 38.  To give force to this requirement, the Convention stipulates that a

court of a contracting state "shall, at the request of one of the parties, refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed."  21 U.S.T. at 2519, 330 U.N.T.S. at 40.

Given this regime, it clearly appears that enforcing arbitration clauses under the New York Convention is an obligation, not a matter committed to district court discretion.  See Ledee, 684 F.2d at 187 & n.3; I.T.A.D. Assocs., Inc. v. Podar Bros., 636 F.2d 75, 77 (4th Cir. 1981); McCreary Tire & Rubber Co. v. CEAT S.p.A., 501 F.2d 1032, 1037 (3d Cir. 1974).  To facilitate the performance of this obligatory task, the FAA confers an armamentarium of powers.  This arsenal includes the express authority to "direct that arbitration be held in accordance with the agreement at any place therein provided for, whether that place is within or without the United States."  9 U.S.C. § 206.

Federal district courts have taken this grant of authority at face value and regularly have compelled arbitrations at  venues beyond the ordering court's jurisdiction.  See, e.g., Hart Enters. Int'l, Inc. v. Anhui Provincial Imp. & Exp. Corp., 888 F. Supp. 587, 591 (S.D.N.Y. 1995) (ordering parties to arbitrate in Beijing); Filanto S.p.A. v. Chilewich Int'l Corp., 789 F. Supp. 1229, 1241 (S.D.N.Y. 1992) (ordering parties to arbitrate in Moscow).  These decisions square with the explicit mandate of section 206.

Despite the clarity of the statutory imperative, the court below feared that it lacked the muscle to enforce an order that the parties arbitrate in London. Grina, slip op. at 3-4. It concluded that if an order to arbitrate was unenforceable, it must be outside the FAA's scope. Id. We think that this analysis both misconstrues the statute and misconceives the law.

Chapter 2 of the FAA makes it crystal clear that the statute contemplates foreign arbitrations. See 9 U.S.C. § 206. The district court's contrary ruling rests on its perceived inability to send court officers to London to enforce a command. Grina, slip op. at 3. While this is a valid concern in the sense that a federal court may not exercise its injunctive powers beyond the reach of its jurisdiction, see Pa. Bureau of Corr. v. U.S. Marshals Serv., 474 U.S. 34, 40 (1985); United States v. N.Y. Tel. Co., 434 U.S. 159, 172-73 (1977), it overlooks alternative means of enforcement. Where, as here, a federal court has personal jurisdiction over the parties, the limitations on its ability to enforce an injunction in a foreign forum are not an obstacle to its issuance of an order compelling arbitration. The court has other means at hand for enforcing such an order. It may, for example, enter a default or an order of dismissal (depending upon which party refuses to arbitrate), or adjudge a recalcitrant party in contempt. See, e.g., LaPrade v. Kidder Peabody & Co., 146 F.3d 899, 900, 907 (D.C. Cir. 1998) (affirming contempt finding and

-12-

imposition of sanctions for "vexatious and dilatory tactics" with respect to compelled arbitration); Morris v. Morgan Stanley & Co., 942 F.2d 648, 653 (9th Cir. 1991) (affirming order of dismissal for refusal to arbitrate); Ames v. Standard Oil Co., 108 F.R.D. 299, 302 (D.D.C. 1985) (similar).

We therefore hold that so long as the parties are bound to arbitrate and the district court has personal jurisdiction over them, the court is under an unflagging, nondiscretionary duty to grant a timely motion to compel arbitration and thereby enforce the New York Convention as provided in chapter 2 of the FAA, even though the agreement in question requires arbitration in a distant forum. Since the arbitration clauses at issue here fall within the scope of the New York Convention, the district court erred in refusing to order arbitration on the ground that it lacked authority to enforce an injunction abroad.

## IV. ARBITRABILITY

Our rejection of the district court's rationale does not end the matter. Courts sometimes reach a correct result for an incorrect reason, and we sometimes affirm a district court's judgment even though we disavow its reasoning. InterGen says that this is such a case.

A party who attempts to compel arbitration must show that a valid agreement to arbitrate exists, that the movant is entitled to invoke the arbitration clause, that the other party is bound by

-13-

that clause, and that the claim asserted comes within the clause's scope. The third of these four elements is dispositive here; as we shall explain, InterGen is not bound by the arbitration clauses contained in any of the several contracts described above.

## A. **General Principles**.

We begin with first principles: "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." AT&T Techs., Inc. v. Communications Workers of Am., 475 U.S. 643, 648 (1986) (quoting United Steelworkers v. Warrior & Gulf Navig. Co., 363 U.S. 574, 582 (1960)). We have interpreted this precept to mean that "a party seeking to substitute an arbitral forum for a judicial forum must show, at a bare minimum, that the protagonists have agreed to arbitrate some claims." McCarthy v. Azure, 22 F.3d 351, 354-55 (1st Cir. 1994) (emphasis in original). The upshot is that courts should be extremely cautious about forcing arbitration in "situations in which the identity of the parties who have agreed to arbitrate is unclear." Id. at 355; accord Bel-Ray Co. v. Chemrite (Pty) Ltd., 181 F.3d 435, 444 (3d Cir. 1999).

This point looms large in any reasoned analysis of the issues on appeal. The signatories to the purchase orders are APG and Bechtel Limited, neither of which is a party to this litigation. The signatories to the various services and support agreements (e.g., APG, RPC, CEC) likewise are strangers to these

-14-

proceedings. In short, no party to this case, plaintiff or defendant, is a signatory to any of the five agreements. Thus, if ALSTOM is to invoke any of the designated arbitration clauses against InterGen, it somehow must go beyond the four corners of the agreements themselves and show both that it is entitled to the agreements' benefits and that InterGen is obliged to shoulder their burdens. Because we conclude that InterGen is not required to arbitrate, see text infra, we do not have occasion to inquire further into whether ALSTOM, itself a nonsignatory, has the right to demand arbitration.

ALSTOM presents a cornucopia of theories to support the notion that nonsignatories can be bound by an arbitration provision in a contract executed solely by others. Because we must evaluate these theories through the prism of the appropriate legal standard, we first ask what law governs.

As between state law and federal common law, we conclude that uniform federal standards are appropriate. This is a federal question case, 28 U.S.C. § 1331, and we therefore look to federal choice of law principles. See Texas Indus., Inc. v. Redcliff Materials, Inc., 451 U.S. 630, 642 (1981). "If the federal statute in question demands national uniformity, federal common law provides the determinative rules of decision." Bhd. of Locomotive Eng'rs v. Springfield Terminal Ry. Co., 210 F.3d 18, 26 (1st Cir. 2000) (citing United States v. Kimball Foods, Inc., 440 U.S. 715,

-15-

728 (1979)).  The federal statute in question here is chapter 2 of the FAA (which adopts and implements the New York Convention).  A central goal of the New York Convention — and the driving force behind Congress's enactment of chapter 2 — was to set out uniform rules governing the recognition and enforcement of international arbitration awards.  See Scherk, 417 U.S. at 520 n.15.  Applying varying state standards in cases falling within the Convention's ambit would be in tension with the elemental purpose of chapter 2. We hold, therefore, that federal common law provides the benchmark against which the cogency of ALSTOM's theories must be measured.[4] See Smith/Enron Cogeneration Ltd. P'ship v. Smith Cogeneration Int'l, Inc., 198 F.3d 88, 96 (2d Cir. 1999), cert. denied, 531 U.S. 815 (2000).  We turn to this task mindful that federal common law incorporates general principles of contract and agency law.  See Thompson-CSF, S.A. v. Am. Arbit. Ass'n, 64 F.3d 773, 776 (2d Cir. 1995); McCarthy, 22 F.3d at 355; see also 9 U.S.C. § 2.

---

[4]To be sure, it might be argued that the parties chose English law to govern disputes arising out of their contracts and that, therefore, their intent was to look to English legal principles. But none of the parties have suggested that we import English law for this purpose.  Accordingly, any such argument has been waived. See Fed. R. Civ. P. 44.1 ("A party who intends to raise an issue concerning the law of a foreign country shall give notice by pleadings or other reasonable written notice."); see also Carey v. Bahama Cruise Lines, 864 F.2d 201, 205-06 (1st Cir. 1988); Cavic v. Grand Bahama Dev. Co., 701 F.2d 879, 882-83 (11th Cir. 1983).

## B.  __Judicial Estoppel__.

ALSTOM's first theory invokes the doctrine of judicial estoppel.  It asserts that the factual allegations in InterGen's original complaint, taken in the aggregate, amount to an admission that InterGen was not merely a passive investor in the Rocksavage and Coryton projects, but, rather, the principal architect of those projects — an architect whose responsibilities included acting as the chief negotiator for the acquisition of the gas turbines. Although InterGen largely retracted these averments in amending its complaint, ALSTOM asseverates that InterGen should be judicially estopped from disclaiming its initial admissions.  See Appellants' Br. at 41 (maintaining that fairness should prevent InterGen from "avoiding arbitration by manipulating its pleadings").

As a general matter, the doctrine of judicial estoppel prevents a litigant from pressing a claim that is inconsistent with a position taken by that litigant either in a prior legal proceeding or in an earlier phase of the same legal proceeding. See Pegram v. Herdrich, 530 U.S. 211, 227 n.8 (2000); see also 18 James Wm. Moore et al., Moore's Federal Practice § 134.30, at 134-62.1 (3d ed. 2003).  The doctrine is designed to ensure that parties proceed in a fair and aboveboard manner, without making improper use of the court system.  New Hampshire v. Maine, 532 U.S. 742, 749-50 (2001).  Consistent with that root purpose, the doctrine is flexible and not subject to mechanical rules for

-17-

determining its applicability.  Id. at 751.  Courts are prone to invoke it "when a litigant is playing fast and loose with the courts," and not otherwise.  Patriot Cinemas, Inc. v. Gen. Cinemas Corp., 834 F.2d 208, 212 (1st Cir. 1987) (citation and internal quotation marks omitted).

Leaving to one side the question of whether ALSTOM has accurately characterized InterGen's original and amended complaints, this case is a poor candidate for judicial estoppel. It is not a situation in which a party has adopted one position, secured a favorable decision, and then taken a contradictory position in search of legal advantage.  To the contrary, InterGen plausibly attributes its revised pleadings to information gleaned during pretrial discovery.  We would not want to institute a rule that unduly inhibits a plaintiff from appropriately adjusting its complaint either to correct errors or to accommodate facts learned during pretrial discovery.

Perhaps more important, InterGen amended its complaint prior to the issuance of any substantive ruling addressed to the original complaint.  Thus, InterGen gained absolutely no advantage from its original pleading.

That is not to say that statements made in a superseded complaint are null and void for all purposes.  Under certain circumstances, such statements may be party admissions, usable as such despite subsequent amendment of the complaint.  See, e.g.,

-18-

Wiseman v. Reposa, 463 F.2d 226, 227 (1st Cir. 1972); Raulie v. United States, 400 F.2d 487, 526 (10th Cir. 1968). That does not mean, however, that a plaintiff is strictly bound by its initial complaint. An amended complaint supersedes the original complaint, and facts that are neither repeated nor otherwise incorporated into the amended complaint no longer bind the pleader. See Kelley v. Crosfield Catalysts, 135 F.3d 1202, 1204 (7th Cir. 1998) (describing such omitted facts as "functus officio"); see also 3 Moore's Federal Practice, supra § 15.17[3], at 15-69. Absent some sign of unfair advantage — and none exists here — the mere retraction of statements made in an original complaint does not justify the invocation of judicial estoppel.

## C. **Equitable Estoppel**.

In a related vein, ALSTOM strives to convince us that the doctrine of equitable estoppel should operate to prevent InterGen from declining to arbitrate. We are not persuaded.

Pertinently, the doctrine of equitable estoppel precludes a party from enjoying rights and benefits under a contract while at the same time avoiding its burdens and obligations. See, e.g., Hughes Masonry Co. v. Greater Clark County Sch. Bldg. Corp., 659 F.2d 836, 838-39 (7th Cir. 1981); see generally Med. Air Tech. Corp. v. Marwan Inv., Inc., 303 F.3d 11, 18 (1st Cir. 2002) (dictum; collecting cases). On this basis, "a party may be estopped from asserting that the lack of his signature on a written

-19-

contract precludes enforcement of the contract's arbitration clause when he has consistently maintained that other provisions of the same contract should be enforced to benefit him." Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH, 206 F.3d 411, 418 (4th Cir. 2000).

In an effort to fit the case at hand within the contours of this model, ALSTOM asserts that InterGen's claims depend upon rights that derive from the purchase orders and other agreements; that its claims for damages are, in effect, an attempt to enforce contractual remedies; and that, therefore, InterGen should be estopped from contesting the applicability of the various arbitration clauses. In constructing this argument, ALSTOM focuses specifically on InterGen's allegation, made only in the original complaint, that it is "the successor to all rights of predecessor entities related to the actions and omissions alleged" in the pleading. In ALSTOM's view, this allegation signals InterGen's intention to assert the contractual rights of RPC and CEC.

We reject these importunings. While ALSTOM accurately quotes the original complaint, that document has very limited significance. See supra Part IV(B). Moreover, InterGen's claims for damages offer no footing for the assertion of equitable estoppel. The claimed damages are not contract damages per se; the amended complaint instead paints a consistent picture portraying InterGen as an investor that relied upon certain extra-contractual

assurances and sustained losses of its own funds when those assurances came to naught.

At any rate, there is a more jagged rent in the fabric of ALSTOM's argument. Although federal courts generally "have been willing to estop a signatory from avoiding arbitration with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed," Thompson-CSF, 64 F.3d at 779 (emphasis in original), they have been hesitant to estop a nonsignatory seeking to avoid arbitration. In the latter situation, estoppel has been limited to "cases [that] involve non-signatories who, during the life of the contract, have embraced the contract despite their non-signatory status but then, during litigation, attempt to repudiate the arbitration clause in the contract." E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S., 269 F.3d 187, 200 (3d Cir. 2001); accord Am. Bureau of Shipping v. Tencara Shipyard S.P.A., 170 F.3d 349, 353 (2d Cir. 1999) (holding a nonsignatory bound by a contract under which it received the direct benefits of lower insurance rates and the ability to sail under the French flag). The record in this case simply does not support a claim that InterGen embraced the contracts and sought to derive direct benefits from them during their currency. Hence, there is no cognizable basis for equitable estoppel.

-21-

### D. **Third-Party Beneficiary**.

ALSTOM argues that InterGen, though not a signatory to the purchase orders, was nonetheless a third-party beneficiary of them (and, therefore, should be bound by the arbitration clauses contained therein). We do not agree.

It is well settled that third-party beneficiary status does not allow the holder to avoid the effect of otherwise enforceable contract provisions. See, e.g., Coastal Steel Corp. v. Tilghman Wheelabrator Ltd., 709 F.2d 190, 203 (3d Cir. 1983), overruled on other grounds by Lauro Lines v. Chasser, 490 U.S. 495 (1989); Trans-Bay Eng'rs & Builders, Inc. v. Hills, 551 F.2d 370, 378 (D.C. Cir. 1976). It follows, then, that a third-party beneficiary of a contract containing an arbitration clause can be subject to that clause and compelled to arbitrate on the demand of a signatory. See E.I. Dupont, de Nemours, 269 F.3d at 195; Indus. Elecs. Corp. v. Power Distrib. Group, 215 F.3d 677, 680 (7th Cir. 2000); cf. Coastal Steel, 709 F.2d at 202-04 (binding a nonsignatory third-party beneficiary to a forum selection clause). The threshold question here is whether InterGen is a third-party beneficiary of the purchase orders.

We must approach this threshold with care since the law requires "special clarity" to support a finding "that the contracting parties intended to confer a benefit" on a third party. McCarthy, 22 F.3d at 362; accord Mowbray v. Moseley, Hallgarten,

-22-

_Estabrook & Weeden, Inc._, 795 F.2d 1111, 1117 (1st Cir. 1986); 3 E. Allan Farnsworth, Farnsworth on Contracts § 10.3, at 13-23 (2d ed. 1998). In measuring ALSTOM's showing against this rigorous requirement, we focus on the specific terms of the purchase orders. Throughout, we bear in mind that courts ought not to distort the clear intention of contracting parties or reach conclusions at odds with the unambiguous language of a contract. _EEOC_ v. _Waffle House, Inc._, 534 U.S. 279, 294 (2002).

The two purchase orders are peas in a pod — identical in all material respects — and their text provides clear guidance. Each purchase order's arbitration clause applies to "[a]ny and all controversies, disputes or claims between Buyer and Seller." The words "Buyer" and "Seller" are explicitly defined. Applying those definitions, the Buyer is Bechtel Limited and the Seller is APG. There are no third-party rights afforded to InterGen. We decline ALSTOM's invitation to read into the purchase orders rights and obligations that the contracting parties did not see fit to include. The fact that each purchase order contains an integration clause reinforces this result. _See_ _McCarthy_, 22 F.3d at 358 (emphasizing that courts should hesitate "to read unwritten terms into agreements containing [integration clauses]").

ALSTOM attempts to blunt the force of this reasoning by pointing to language in the purchase orders stating that "[t]o the extent that Buyer is not the ultimate consumer of the Equipment

being purchased herein, all rights, benefits and remedies conferred upon Buyer by this Agreement shall also accrue and be available to and are for the express benefit of Owner." We find threadbare ALSTOM's suggestion that this language assigns rights and benefits to InterGen (and, thus, extends the arbitration provisions to it). InterGen is not the "Owner." Rather, the term "Owner" is defined as meaning either RPC or CEC (depending upon which purchase order one reads).[5]

ALSTOM's rejoinder is that InterGen is (at least indirectly) the parent company of RPC and CEC and, in the original complaint, linked itself with those entities. That rejoinder does not get ALSTOM very far. In the first place, the operative pleading is the amended complaint, see supra Part IV(B), and that pleading does not paint so intimate a corporate picture. In the second place, even were we prepared to accept both the phraseology of the original complaint and ALSTOM's self-serving interpretation of it, an intimate corporate relationship, without more, is not tantamount to an assignment of specific rights. There is an important distinction between a nonsignatory who may benefit from a signatory's exercise of its contractual rights (because of, say,

_____

[5]Interestingly, the purchase order for the Coryton project contains additional language extending the definition of "Owner" to CEC's "successors in title and permitted assignees." ALSTOM makes no claim that this additional language is significant here, and there is nothing to show either that CEC had a successor in title or that APG permitted it to assign any rights.

an equity stake) and a third-party beneficiary.  See E.I. DuPont de Nemours, 269 F.3d at 196-97 (explaining that a parent company not explicitly named in an agreement "was not an intended third party beneficiary . . . any more than any parent who expects to benefit from the success of . . . [its] subsidiary").  In other words, a benefitting third party is not necessarily a third-party beneficiary.  McCarthy, 22 F.3d at 362.

That ends this aspect of the matter.  InterGen, as an elder in a corporate family that included both RPC and CEC, plainly stood to gain from their commercial successes.  But that verity is not enough to make ALSTOM's point.  The critical fact is that the purchase orders neither mention nor manifest an intent to confer specific legal rights upon InterGen.  Consequently, ALSTOM may not require InterGen to fulfill any corresponding legal duties (such as the duty to arbitrate).

**E.  Agency.**

ALSTOM also contends that InterGen became bound by the arbitration clauses when Bechtel Limited executed the purchase orders.  This contention invokes traditional principles of agency law in an effort to show that Bechtel Limited acted as InterGen's agent.  The effort founders.

It is hornbook law that an agent can commit its (nonsignatory) principal to an arbitration agreement.  See Restatement (Second) of Agency § 7 (1958); see also Thompson-CSF,

64 F.3d at 777; In re Oil Spill by the Amoco Cadiz, 659 F.2d 789, 795-96 (7th Cir. 1981); cf. Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 7 F.3d 1110, 1122 (3d Cir. 1993) (extending a principal's arbitration obligation to its nonsignatory agent). But the requirements for such vicarious responsibility are exacting:  "[n]ot only must an [agency] arrangement exist . . . so that one [party] acts on behalf of the other and within usual agency principles, but the arrangement must be relevant to the [legal obligation in dispute]." Phoenix Can. Oil Co. v. Texaco, Inc., 842 F.2d 1466, 1477 (3d Cir. 1988).  For present purposes, that means that ALSTOM must demonstrate not only that Bechtel Limited was InterGen's agent but also that it acted as such in executing the purchase orders.

InterGen concedes that the technical services agreement entered into by and between it and Bechtel Power created a circumscribed agency relationship.  But Bechtel Limited — not Bechtel Power — executed the purchase orders and committed to arbitrate disputes arising thereunder.

More importantly, ALSTOM cannot establish, on this record, an agency relationship between InterGen and any Bechtel entity that extended to the execution of the purchase orders.  The technical services agreement covers only preliminary tasks (e.g., licensing, permitting, and design).  That agreement (and, thus, the agency relationship created thereby) did not extend to the

-26-

acquisition of the gas turbines. Acquisition was the subject of a separate set of contracts (the EPC agreement and, ultimately, the purchase orders). InterGen was not a party to any of those agreements.

To recapitulate, although InterGen may have had an agency relationship with a Bechtel entity for certain (limited) purposes, the record is bereft of any evidence suggesting that a Bechtel entity acted as InterGen's agent in committing to carry out the purchase orders. Without evidence of such a commitment, InterGen cannot, under applicable principles of agency law, be bound by the arbitration clauses contained in the purchase orders.

## F. **Alter Ego**.

ALSTOM's final avenue to arbitrability also proves to be a dead end. It suggests that InterGen is the alter ego of RPC and CEC (and, therefore, that those entities' obligations to arbitrate bind InterGen as well). In support of this thesis, ALSTOM notes that both RPC and CEC are (at least indirectly) subsidiaries of InterGen; that both are staffed by InterGen employees; that their boards of directors are composed of InterGen officials; and that officers of InterGen acted on their behalf in various matters, including execution of the services and support agreements. InterGen does not dispute these raw facts but deems them insufficient to establish an alter ego relationship.

Under federal common law, there is no precise litmus test for determining when the corporate form should be ignored. <u>Alman</u> v. <u>Danin</u>, 801 F.2d 1, 3 (1st Cir. 1986). The overarching principle, however, is that the corporate form may be disregarded only if considerations of fairness or public necessity warrant such a step. <u>Town of Brookline</u> v. <u>Gorsuch</u>, 667 F.2d 215, 221 (1st Cir. 1981). From this first principle, we must derive a test tailored to the demands of the federal statute at issue.

We are unaware of any decision that has devised a test for alter ego liability in a case involving chapter 2 of the FAA, and the parties have cited none. Given this lack of direct precedential guidance, we borrow from the standards developed in other statutory contexts that manifest a need for national uniformity, most notably ERISA and the NLRA. The relevant cases suggest an inquiry focusing on (1) whether the entities in question have ignored the independence of their separate operations, (2) whether the defendant employed the multiplicity of entities as part of an artifice or scheme to defraud, and (3) whether holding the corporate form inviolate would lead to substantial injustice or inequity. <u>See</u> <u>United Elec., Radio & Mach. Workers</u> v. <u>163 Pleasant St. Corp.</u>, 960 F.2d 1080, 1092-93 (1st Cir. 1992) (addressing the ERISA context); <u>see</u> <u>also</u> <u>NLRB</u> v. <u>Greater Kan. City Roofing</u>, 2 F.3d 1047, 1052 (10th Cir. 1993) (collapsing the inquiry into a substantially similar two-part test in the NLRA context).

Applying this type of test inevitably takes the inquirer down a murky road so courts have hung lanterns to light the way. The independent operations prong, for instance, looks at such things as

> (1) whether a corporation is operated as a separate entity; (2) commingling of funds and other assets; (3) failure to maintain adequate records or minutes; (4) the nature of the corporation's ownership and control; (5) absence of corporate assets and undercapitalization; (6) use of a corporation as a mere shell, instrumentality or conduit of an individual or another corporation; (7) disregard of legal formalities and the failure to maintain an arms-length relationship among related entities; and (8) diversion of the corporation's funds or assets to noncorporate uses.

United States v. Diviner, 822 F.2d 960, 965 (10th Cir. 1987). The other prongs are similarly nuanced. These subtleties mean that courts must apply such tests flexibly and with due regard for the demands of the federal statute at issue.

In this case, ALSTOM's argument suffers from a failure of proof. Despite several months of discovery, it has failed to raise a substantial question about the corporate integrity of either RPC or CEC. The best that ALSTOM can do is to point out a modest amount of corporate overlap (including the performance of dual corporate functions by certain individuals). It is wholly unable to refute InterGen's contention that the InterGen employees who managed the subsidiaries did so under specific contractual agreements for the provision of management services.

-29-

The case law cautions against invoking an equitable remedy in situations such as this. Common ownership and common management, without more, are insufficient to override corporate separateness and pave the way for alter ego liability. See Alpine View Co. v. Atlas Coco AB, 205 F.3d 208, 218-19 (5th Cir. 2000); Mass. Carpenters Cent. Coll'n Agency v. Belmont Concrete Corp., 139 F.3d 304, 308 (1st Cir. 1998); Lili Fashions Corp. v. NLRB, 80 F.3d 743, 749 (2d Cir. 1996); Hunter v. Youthstream Media Networks, 241 F. Supp. 2d 52, 59 (D. Mass. 2002).

In all events, there is a broader reason why we find the alter ego doctrine inapposite. As a general rule, the doctrine is thought to be equitable in nature. Consequently, it "can be invoked only where equity requires the action to assist a third party." McCarthy, 22 F.3d at 362-63 (citations and internal quotation marks omitted); see Mass. Carpenters Cent. Coll'n Agency v. A.A. Bldg. Erectors, Inc., ___ F.3d ___, ___ (1st Cir. 2003) [No. 02-2006, slip op. at 8] (describing the alter ego doctrine as "a tool to be employed when the corporate shield, if respected, would inequitably prevent a party from receiving what is otherwise due and owing from the person or persons who have created the shield"). Federal common law emphasizes the equitable character of the alter ego doctrine, instructing federal courts that "the corporate form may be disregarded in the interests of justice where it is used to defeat an overriding public policy," but not

-30-

otherwise.  Bangor Punta Operations, Inc. v. Bangor & A.R. Co., 417 U.S. 703, 713 (1974).

In this case, no compelling policy objective would be served by finding InterGen and its indirect subsidiaries to be alter egos of each other.  While the Supreme Court frequently has enunciated a federal policy favoring arbitration, e.g., Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983), that policy does not extend to situations in which the identity of the parties is in dispute, see McCarthy, 22 F.3d at 355; Painewebber, Inc. v. Hartmann, 921 F.2d 507, 511 (3d Cir. 1990). Here, moreover, strong public policy considerations favor keeping intact InterGen's elaborate corporate collage.  Not the least of these is the value of deferring to the principle of limited liability — a principle that we have called "the cornerstone of corporate law."  DeBreceni v. Graf Bros. Leasing, Inc., 828 F.2d 877, 879 (1st Cir. 1987).

In a last-ditch effort to elude the grasp of these precedents, ALSTOM asserts that InterGen has "admitted that it is an alter ego of its subsidiaries." Appellants' Br. at 50 (emphasis in original).  But the record will not bear the weight of this assertion.  ALSTOM supports it primarily by citing to an averment in InterGen's original complaint.[6]  That complaint has since been

_____

[6]The pertinent section of the original complaint reads: "Intergen N.V. . . . either has the rights or is the successor to all rights of predecessor entities related to the actions and

-31-

amended to delete the averment, and we previously have explained why it is not sufficient to support a claim of judicial estoppel. See supra Part IV(B). The same reasoning suffices to explain why the excerpted passage is inconclusive for purposes of the alter ego doctrine.

## V. CONCLUSION

Both InterGen and ALSTOM are sophisticated commercial actors, and each has been quite deliberate in constructing and deploying an elaborate web of affiliates to handle the Rocksavage and Coryton projects. As a result of these posturings, neither of them is a signatory to the underlying contracts. For the reasons elucidated above, we find unpersuasive ALSTOM's myriad arguments as to why InterGen should nonetheless be bound to the arbitration clauses contained in those contracts. Therefore, the claims asserted by InterGen in its amended complaint are not subject to compulsory arbitration.

We need go no further. We uphold (albeit for different reasons) the district court's denial of ALSTOM's motion to compel arbitration. That is the only matter before us, and we remit the case to the district court for further proceedings consistent with this opinion. Since InterGen's motion to remand the action to the state court implicates the district court's subject matter

omissions alleged in this Complaint."

-32-

jurisdiction, we instruct the court, as the first order of business, to revisit that issue.

**<u>Affirmed</u>**.