STATE OF MAINE
CUMBERLAND, ss.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-19-467

AMANDA HOWLAND )
)
     Plaintiff, )
)
v. )  ORDER ON DEFENDANTS' MOTION
)  TO DISMISS AND COMPEL
MICHAEL WILLIAMS, )  ARBITRATION
CHRISTIAN KJAER, VCP ONE )
LLC and ELLEVET SCIENCES LLC, )
)
     Defendants. )

Before the Court is Defendants Michael Williams, Christian Kjaer, VCP One LLC, and ElleVet Sciences LLC's (hereinafter "Defendants") Motion to Dismiss Plaintiff Amanda Howland's Complaint and to Compel Arbitration; or, in the alternative, Defendants Motion to Compel Arbitration and to Stay this Matter pending Arbitration.

For the following reasons, Defendants' Motion to Compel Arbitration and to Stay this Matter pending Arbitration is granted.

## I.   Background

In March 2016, Plaintiff Amanda Howland ("Ms. Howland") originated an idea for a cannabis/CBD product for pets. Two months later, she met and started dating Defendant Christian Kjaer ("Kjaer"), a then employee of IDEXX Laboratories, Inc. (Pl.'s Compl. ¶¶ 12-13.) Kjaer expressed interest in working with Ms. Howland and commercializing the idea. (Pl.'s Compl. ¶ 13.) Kjaer was working abroad for IDEXX at the time; and, Ms. Howland began developing the business. (Pl.'s Compl. ¶¶ 14-18.)

Kjaer presented Ms. Howland's idea for a cannabis/CBD product for pets to Defendant Michael Williams ("Williams"), a former IDEXX employee. By November

2016, neither Kjaer nor Williams were employed at IDEXX. Instead, they were fully committed to working with Ms. Howland. (Pl.'s Compl. ¶¶ 19-20, 22.) Ms. Howland alleges, however, that despite their expressed interest and commitment, it was she who continued to develop the product and production capacity.[1] Ms. Howland claims she did this with little or no assistance from Kjaer or Williams. (Pl.'s Compl. ¶ 24.)

Over the next several months, Kjaer began to increase his financial contribution in the business and insisted that he be appointed CEO. (Pl.'s Compl. ¶ 21.) In the spring of 2017, Kjaer moved into Ms. Howland's Portland residence where she lived with her three daughters.[2] (Pl.'s Compl. ¶ 23.) By August 2017, Kjaer continued to insist that he have a larger ownership share in the future company and became increasingly hostile towards Ms. Howland. (Pl.'s Compl. ¶ 25.) In response, and in an effort to salvage their relationship, Ms. Howland agreed that Kjaer would be appointed CEO and that she would become the CTO – later changed to Chief Branding Officer. (Pl.'s Compl. ¶ 26.)

In September 2017, ElleVet Sciences LLC, (hereinafter the "Company"), was formed in Delaware. Attorney Andrew Abramowitz was hired to execute a Limited Liability Company Agreement (the "LLC Agreement"). (Pl.'s Compl. ¶ 30.) The LLC Agreement was signed by Ms. Howland and Kjaer in their individual capacities, whereas Williams signed it on behalf of VCP One, LLC, the entity he created with the assistance of Attorney Abramowitz for purposes of investing in the Company. (Pl.'s Compl. ¶ 30.) Abramowitz had represented Williams in other business ventures in the past, and

---

[1] While both Kjaer and Ms. Howland "took steps," Ms. Howland produced the first dog-chew prototype, engaged the eventual manufacturer, located the grower of the CBD strain, and engaged a branding company to assist with the website and packaging. (Pl.'s Compl. ¶ 24.)

[2] Ms. Howland asserts that, despite living with her in her home with her three daughters, Kjaer rarely contributed to their rent or other living expenses. (Pl.'s Compl. ¶ 23.)

allegedly represented Williams's personal interests in the Company. (Pl.'s Compl. ¶¶ 28-29.) Together, Ms. Howland, Kjaer and Williams constituted the Board of Managers, who agreed that Ms. Howland would be responsible for developing the Company's sales, marketing, and managing day-to-day operations. (Pl.'s Compl. ¶¶ 33-34, 40.)

By June 2018, the Company had grown significantly, acquiring office space in Portland and additional staff. (Pl.'s Compl. ¶¶ 35-40.) In January 2019, the Company hired Stephen Cital, a Registered Veterinary Technician, to represent the Company at conferences and promote its product to veterinary clinics. (Pl.'s Compl. ¶¶ 42-43.)

Ms. Howland alleges that Mr. Cital often misrepresented the product at conferences. She consulted with the Company's outside general counsel who agreed that Mr. Cital's statements were "legally problematic." (Pl.'s Compl. ¶¶ 44-46, 48.) Ms. Howland complained to Kjaer and Williams, but was told to stop "overreacting," that her "tolerance level for Cital's misrepresentations was too low." (Pl.'s Compl. ¶¶ 48-50.) Mr. Cital began to "bad-mouth" Ms. Howland and members of her team, and eventually blocked her from the Company's social media accounts. (Pl.'s Compl. ¶¶ 46, 51.)

By April 2019, the Company was projected to earn $8 to $10 million in sales for the year. (Pl.'s Compl. ¶ 54.) As a result of this exponential growth, Ms. Howland became responsible for managing a larger marketing team, and Williams recommended appointing her as the CEO of a to-be human division, owned equally by the three Managers. (Pl.'s Compl. ¶¶ 52, 54, 55.)

Not long thereafter, tensions between Ms. Howland and Kjaer began to escalate. (Pl.'s Compl. ¶ 56.) Ms. Howland alleges, *inter alia*, that Kjaer began ignoring her ideas, publicly dismissing her comments, and eventually refused to talk to her. (Pl.'s Compl. ¶¶ 56-58.) Her personal and professional life were "thrown upside down," due to the

fact that Kjaer, the CEO, wasn't speaking to her, yet continued to live at her home.[3] (Pl.'s Compl. ¶¶ 58-59.) This left Ms. Howland "without any refuge," and the effect of Kjaer's actions on her job performance was "unmistakable." (Pl.'s Compl. ¶ 63.) Ultimately, Ms. Howland and Kjaer's personal relationship ended.

The Company, however, continued to grow. Projections suggested that the Company could be sold for $400 to $500 million in three to four years. (Pl.'s Compl. ¶ 65.) It was at this point, Ms. Howland alleges, Williams and Kjaer began their campaign to oust her from the Company, taking numerous actions to "insure that only [Kjaer and Williams] would reap the rewards of ElleVet's future success." (Pl.'s Compl. ¶¶ 64, 71.)

Williams hired Tara Jenkins, a human resources officer and former IDEXX employee, to conduct an employee survey and review Ms. Howland's job performance. (Pl.'s Compl. ¶¶ 66-67.) Ms. Howland suspected that Ms. Jenkins was not truly "independent," and that the survey and review were an attempt to conceal Kjaer's and Williams's ulterior motive.[4] (Pl.'s Compl. ¶¶ 67, 69.) Also, in September 2019, Kjaer and Williams incorporated two British entities in their own names, Evet Pharma Limited and ElleGen Sciences Limited. (Pl.'s Compl. ¶¶ 72-75.) Ms. Williams was not informed of the Company's international expansion, and did not receive any ownership interest. (Pl.'s Compl. ¶ 76.)

At a Board of Managers meeting on September 16, 2019, Williams introduced the so-called "First Amendment" to the LLC Agreement that allegedly "robbed [Ms.]

---

[3] Ms. Howland continued to reach out to Williams, the Chairman of the Board, to seek advice about her role at the Company and to inform him that she was unable to function effectively due to Kjaer's behavior. (Pl.'s Compl. ¶¶ 60, 68.) Williams allegedly told her she was "mixing the personal and the professional," and that her issues were "emotional and personal and that he would not get involved." (Pl.'s Compl. ¶ 61.)

[4] The survey was sent out on September 10, 2019, to approximately twenty employees, and Ms. Jenkins personally interviewed eight employees. (Pl's Compl. ¶ 70.)

Howland of any control over the future of ElleVet."[5] (Pl.'s Compl. ¶¶ 78, 83.) Ms. Howland alleges that she would not have signed the First Amendment had she not been in a "state of distress" due to Kjaer and Williams's actions. (Pl.'s Compl. ¶¶ 81-82, 87.) She claims she acted in reliance upon Williams's representation that the First Amendment was "no big deal," that it was simply to ensure that the Company could continue to function "in case one of the Managers was in a car accident."[6] (Pl.'s Compl. ¶ 78.)

The First Amendment removed the requirement that major decisions required a supermajority vote, meaning Kjaer and Williams could make any Company decision without Ms. Howland's consent, including, *inter alia*:

a) Transfer ElleVet assets to an entity solely affiliated with Kjaer and Williams
b) Establish subsidiaries or affiliated entities in which Williams and Kjaer have an ownership interest in, but Ms. Howland does not;
c) Issue additional ownership units in ElleVet to dilute Ms. Howland's interest;
d) Make loans to individuals or entities affiliated with Williams and Kjaer
e) Amend the LLC Agreement to allow Williams and Kjaer to take actions to further their own interests.

(Pl.'s Compl. ¶¶ 33, 84, 86.)

Ms. Howland alleges that Kjaer and Williams then targeted Ms. Howland's employment status. On October 9, 2019, Williams placed Ms. Howland on immediate administrative leave. (Pl.'s Compl. ¶ 90.) Williams's decision was partly based on his

---

[5] Ms. Howland had previously reviewed the LLC Agreement with her financial advisor and attorney, and informed Kjaer and Williams that amendments required unanimous consent, and that all major Company actions required a supermajority vote. (Pl.'s Compl. ¶¶ 77, 83.)

[6] Ms. Howland later learned that Kjaer and Williams conferred with Attorney Abramowitz after she told them about the supermajority vote requirement.

own observations, and the results of Ms. Howland's negative employment performance review.[7] (Pl.'s Compl. ¶¶ 88, 90.) She left the office in "utter shock." (Pl.'s Compl. ¶ 93.)

The next day, the Board eliminated Ms. Howland's management functions by virtue of the so-called "Second Amendment." (Pl.'s Compl. ¶ 96.) Again, Ms. Howland claims she would not have signed the Second Amendment had she not been in a state of distress; and, had she not relied upon Williams's alleged misrepresentation that it was "duplicative of her employment agreement." (Pl.'s Compl. ¶ 97.) It also appears that the Board approved a "form of separation agreement," despite Ms. Howland's refusal to sign it. (Pl.'s Compl. ¶ 95.)

Ultimately, on November 10, 2019, the Board passed a final resolution terminating Ms. Howland's employment. (Pl.'s Compl. ¶¶ 100, 102.) As a result of this Board meeting, Ms. Howland was left jobless, and would likely be liable for up to $200,000 in taxes, despite receiving a $75,000 salary at that time.[8] (Pl.'s Compl. ¶ 103.)

On November 25, 2019, Ms. Howland filed a nine count complaint against Defendants alleging: (Count I) Breach of Fiduciary Duties; (Count II) Civil Conspiracy / Aiding and Abetting; (Count III) Intentional Infliction of Emotional Distress; (Count IV) Negligent Infliction of Emotional Distress; (Count V) Fraudulent Misrepresentation; (Count VI) Negligent Misrepresentation; (Count VII) Declaration of Invalidity, as to the First and Second Amendments; (Count VIII) Promissory Estoppel;

---

[7] The employment survey revealed that employees complained about Ms. Howland's job performance, inability to communicate effectively, and her general tendency to micromanage her team. (Pl.'s Compl. 88.) However, Ms. Howland alleges that the results were "pre-ordained," considering almost all of the employees who were surveyed were hired just before or during the time she was subjected to Kjaer's "continuing emotional abuse." (Pl.'s Compl. ¶ 89.)

[8] Kjaer and Williams also allegedly took further "punitive" action by passing a resolution to prevent a – previously agreed upon – distribution to cover the tax liability from income earned by the Company. (Pl.'s Compl. ¶ 103.)

and (Count IX) Injunctive Relief.[9] Defendants filed this Motion seeking to dismiss the Complaint and compel arbitration pursuant to the LLC Agreement's arbitration clause, or in the alternative, to compel arbitration and stay this matter pending arbitration.

## II. Standard of Review

A motion to dismiss pursuant to M.R. Civ. P. 12(b)(6) tests the legal sufficiency of the complaint. *State v. Weinschenk*, 2005 ME 28, ¶ 10, 868 A.2d 200. When reviewing a motion to dismiss pursuant to M.R. Civ. P. 12(b)(6) "the court will examine the complaint in the light most favorable to the plaintiff to determine whether it sets forth elements of a cause of action or alleges facts that would entitle the plaintiff to relief pursuant to some legal theory." *Livonia v. Town of Rome*, 1998 ME 39, ¶ 5, 707 A.2d 83.

We accept as true the material allegations in the complaint. *Id.* The complaint will be dismissed "only when it appears beyond a doubt that a plaintiff is entitled to no relief under any set of facts that he might prove in support of his claim." *Heber v. Lucerne-in-Maine Village Corp.*, 2000 ME 137, ¶ 7, 755 A.2d 1064.

## III. Discussion

### A. Applicable Law

At the outset, the Court must address the interplay between the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16, and the LLC Agreement's choice of law provision, which provides:

---

[9] Plaintiff also filed a complaint with the Maine Human Rights Commission on November 20, 2019, against Defendants alleging unlawful sex discrimination and retaliation. Plaintiff's intention is to amend the Complaint upon exhausting her administrative remedies. (Pl.'s Opp'n to Def.s' Mot. Dismiss 4, n.1.)

> This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to conflicts of laws provisions.

(Def.s' Ex. 1, at 21.) When a contract involving interstate commerce contains an arbitration provision, the FAA governs, and ordinarily preempts state law.[10] *Stenzel v. Dell, Inc.*, 2005 ME 37, ¶ 7, 870 A.2d 113. "In deciding whether an arbitration clause is enforceable in the first place, however, courts apply state contract law principles" and will generally interpret the contract in accordance with the contract's chosen state's law. *Id.*

Here, Plaintiff does not dispute the validity or enforceability of the arbitration agreement. Accordingly, the Court incorporates the FAA and federal substantive law governing arbitrability as authority.[11]

### B. *The Arbitration Clause*

The FAA authorizes a court to compel arbitration due to an "alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration." 9 U.S.C. §§ 3-4. While the FAA embodies a strong federal policy in favor of arbitration, "[a]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which it has not agreed so to submit." *Hogan v. SPAR Grp., Inc.*, 914 F.3d 34, 38 (1st Cir. 2019) (citations omitted). A party attempting to compel arbitration must show that "[1] a valid agreement to arbitrate exists, [2] that the movant is entitled

---

[10] As Defendants point out, the FAA applies to any "written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . ." providing that such agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

[11] "The [FAA] . . . calls for the application, in state as well as federal courts, of federal substantive law regarding arbitration." *Preston v. Ferrer*, 552 U.S. 346, 349 (2008); *see Perry v. Thomas*, 482 U.S. 483, 493 n.9 (1987) ("state law . . . is applicable *if* that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally.") (emphasis in original).

to invoke the arbitration clause, [3] that the other party is bound by that clause, and [4] that the claim asserted comes within the clause's scope." *InterGen N.V. v. Grina*, 344 F.3d 134, 142 (1st Cir. 2003).

Section 9.14(a) of the LLC Agreement (hereinafter the "Arbitration Clause") provides, in relevant part:

> ALL DISPUTES OR CLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE SUBMITTED TO BINDING ARBITRATION IN PENNSYLVANIA IN ACCORDANCE WITH THE COMMERCIAL ARBITRATION RULES OF THE AMERICAN ARBITRATION ASSOCIATION.

(Def.s' Ex. 1, at 21.) As previously stated, Plaintiff does not contest the existence of a valid arbitration agreement, that Defendants are entitled to invoke it, or that she is a party bound by the clause. Indeed, Plaintiff concedes "that the LLC Agreement contains an arbitration provision and that the arbitration provision applies to claims arising under the LLC Agreement" and further agrees that "certain aspects of [her] claims arguably fall within the scope of an arbitration provision." (Pl.'s Opp'n to Def.s' Mot. Dismiss 1, 4.) Consequently, the Court's analysis is limited to Plaintiff's principal contention that Counts III and IV – the emotional distress claims – fall outside the scope of the Arbitration Clause.[12] (Pl.'s Opp'n to Def.s' Mot. Dismiss 4.)

The Arbitration Clause is ambiguous as to the question of whether IIED or NIED claims fall within its scope. In determining whether the parties agreed to arbitrate a certain dispute "due regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself resolved in favor of arbitration." *Volt Info. Scis. v. Bd. Of Trs.*, 489 U.S. 468, 476-77 (1989) (internal citation omitted). The

---

[12] Plaintiff's Opposition effectively acknowledges that Counts I, II, and V-IX fall within the scope of the Arbitration Clause, having failed to set forth any argument suggesting otherwise.

Court will compel arbitration "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *IPM Corp. v. Brown Forman Corp.*, 627 F.3d 440, 450 (1st Cir. 2010).

While Counts III and IV may be distinguishable from Plaintiff's remaining claims, the Court is persuaded by Defendants' position that the basis for Counts III and IV bare a significant relationship to the parties' rights and obligations under the LLC Agreement and their conduct as Members and Managers of the Company.[13] (Mot. Dismiss 9; Def.s' Reply to Pl.'s Opp'n 2-6.)

Consistent with the federal policy favoring arbitration, the Court concludes that Plaintiff's claims are properly within the scope of the Arbitration Clause and shall be submitted to binding arbitration pursuant to Section 9.14 of the LLC Agreement.

## IV. Conclusion

Based on the foregoing, Defendants' Motion to Compel Arbitration is GRANTED; and this action is STAYED pending arbitration.

The Clerk is directed to incorporate this Order into the docket by reference pursuant to Maine Rule of Civil Procedure 79(a).

Dated: 4/24/2020

MaryGay Kennedy, Justice
Maine Superior Court

**Entered on the Docket: 4/30/2020**

REC'D CUMB CLERKS OFC
APR 24 '20 PM4:21

---

[13] Plaintiff relies on Kjaer's actions, including his refusal to speak with her, Williams's refusal to help, and generally, the events leading up to her termination. (Pl.'s Opp'n to Def.s' Mot. Dismiss 6-7.)